**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

XAVIER ALVAREZ, AKA Javier
Alvarez,
            *Defendant-Appellant.*

No.08-50345

D.C. No.
2:07-cr-01035-
RGK-1

OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted
November 4, 2009—Pasadena, California

Filed August 17, 2010

Before: Thomas G. Nelson, Jay S. Bybee, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge Bybee

11845

**COUNSEL**

Jonathan D. Libby, Deputy Federal Public Defender, Los Angeles, California, for the defendant-appellant.

Craig H. Missakian, Assistant U.S. Attorney, Cyber and Intellectual Property Section, Los Angeles, California, for the plaintiff-appellee.

**OPINION**

M. SMITH, Circuit Judge:

Defendant-Appellant Xavier Alvarez conditionally pleaded guilty to one count of falsely verbally claiming to have received the Congressional Medal of Honor, in violation of the Stolen Valor Act (the Act), 18 U.S.C. § 704(b), (c),[1] reserving his right to appeal the Act's constitutionality.

---

[1]Although predecessor versions have existed since 1948, the current form of the Act was passed in 2006. In that year, Congress found that "[f]raudulent claims surrounding the receipt of the Medal of Honor [and other Congressionally authorized military medals, decorations, and awards] damage the reputation and meaning of such decorations and medals," and that "[l]egislative action is necessary to permit law enforcement officers to protect the reputation and meaning of military decorations and medals." Stolen Valor Act of 2005, Pub. L. No. 109-437, § 2(1), (3), 120 Stat. 3266, 3266 (2006).

The Act, as presently drafted, applies to pure speech; it imposes a *criminal* penalty of up to a year of imprisonment, plus a fine, for the *mere utterance or writing* of what is, or may be perceived as, a false statement of fact—without anything more.

The Act therefore concerns us because of its potential for setting a precedent whereby the government may proscribe speech solely because it is a lie. While we agree with the dissent that most knowingly false factual speech is unworthy of constitutional protection and that, accordingly, many lies may be made the subject of a criminal law without creating a constitutional problem, we cannot adopt a rule as broad as the government and dissent advocate without trampling on the fundamental right to freedom of speech. *See* Jonathan D. Varat, *Deception and the First Amendment: A Central, Complex, and Somewhat Curious Relationship*, 53 UCLA L. Rev. 1107, 1109 (2006) ("[A]ccepting unlimited government power to prohibit all deception in all circumstances would invade our rights of free expression and belief to an intolerable degree, including most notably—and however counterintuitively—our rights to personal and political self rule."). Rather we hold that regulations of false factual speech must, like other content-based speech restrictions, be subjected to strict scrutiny unless the statute is narrowly crafted to target the type of false factual speech previously held proscribable because it is not protected by the First Amendment.

The rule the government and dissent urge us to apply in order to uphold the Act would, if adopted, significantly enlarge the scope of existing categorical exceptions to First Amendment protection. All previous circumstances in which lies have been found proscribable involve not just knowing falsity, but additional elements that serve to narrow what speech may be punished. Indeed, if the Act is constitutional under the analysis proffered by Judge Bybee, then there would be no constitutional bar to criminalizing lying about

one's height, weight, age, or financial status on Match.com or Facebook, or falsely representing to one's mother that one does not smoke, drink alcoholic beverages, is a virgin, or has not exceeded the speed limit while driving on the freeway. The sad fact is, most people lie about some aspects of their lives from time to time. Perhaps, in context, many of these lies are within the government's legitimate reach. But the government cannot decide that some lies may not be told without a reviewing court's undertaking a thoughtful analysis of the constitutional concerns raised by such government interference with speech.

Finding no appropriate way to avoid the First Amendment question Alvarez poses, we hold that the speech proscribed by the Act is not sufficiently confined to fit among the narrow categories of false speech previously held to be beyond the First Amendment's protective sweep. We then apply strict scrutiny review to the Act, and hold it unconstitutional because it is not narrowly tailored to achieving a compelling governmental interest.

## FACTUAL AND PROCEDURAL BACKGROUND

Xavier Alvarez won a seat on the Three Valley Water District Board of Directors in 2007. On July 23, 2007, at a joint meeting with a neighboring water district board, newly-seated Director Alvarez arose and introduced himself, stating "I'm a retired marine of 25 years. I retired in the year 2001. Back in 1987, I was awarded the Congressional Medal of Honor. I got wounded many times by the same guy. I'm still around."

Alvarez has never been awarded the Congressional Medal of Honor, nor has he spent a single day as a marine or in the service of any other branch of the United States armed forces. In short, with the exception of "I'm still around," his self-introduction was nothing but a series of bizarre lies.

Alvarez's misrepresentations during the 2007 water district board meeting were only the latest in a long string of fabrica-

tions. Apparently, Alvarez makes a hobby of lying about himself to make people think he is "a psycho from the mental ward with Rambo stories." The summer before his election to the water district board, a woman informed the FBI about Alvarez's propensity for making false claims about his military past. Alvarez told her that he won the Medal of Honor for rescuing the American Ambassador during the Iranian hostage crisis, and that he had been shot in the back as he returned to the embassy to save the American flag. Alvarez reportedly told another woman that he was a Vietnam veteran helicopter pilot who had been shot down but then, with the help of his buddies, was able to get the chopper back into the sky.

In addition to his lies about military service, Alvarez has claimed to have played hockey for the Detroit Red Wings, to have worked as a police officer (who was fired for using excessive force), and to have been secretly married to a Mexican starlet. As the district court observed, Alvarez "live[s] in a world, a make-believe world where [he] just make[s] up stories all the time . . . . [T[here's no credibility in anything [he] say[s]."

After the FBI obtained a recording of the water district board meeting, Alvarez was indicted in the Central District of California on two counts of violating 18 U.S.C. § 704(b), (c)(1). Specifically, he was charged with "falsely represent[-ing] verbally that he had been awarded the Congressional Medal of Honor when, in truth and as [he] knew, he had not received the Congressional Medal of Honor." Alvarez appears to be the first person charged and convicted under the present version of the Act.

Alvarez moved to dismiss the indictment, claiming that the Act is unconstitutional both on its face and as applied to him. The district court denied the motion. Alvarez then pleaded guilty to the first count, reserving his right to appeal the First Amendment question. He was sentenced to pay a $100 special

assessment, a $5,000 fine, to serve three years of probation, and to perform 416 hours of community service. This case addresses Alvarez's timely appeal of the constitutional issue."

## JURISDICTION AND STANDARD OF REVIEW

Alvarez brings both facial and as-applied[2] challenges to the validity of the Act under the First Amendment. We review the constitutional question de novo. *See Perry v. L.A. Police Dep't*, 121 F.3d 1365, 1367-68 (9th Cir. 1997).

We have jurisdiction pursuant to 28 U.S.C. § 1291.

## DISCUSSION

The Act provides:

> Whoever falsely represents himself or herself, verbally or in writing, to have been awarded any decoration or medal authorized by Congress for the Armed Forces of the United States, any of the service medals or badges awarded to the members of such forces, the ribbon, button, or rosette of any such badge, decoration, or medal, or any colorable imitation of such item shall be fined under this title, imprisoned not more than six months, or both.

18 U.S.C. § 704(b). The prescribed prison term is enhanced to one year if the decoration involved is the Congressional

---

[2]Because, as described further *infra*, the Act is so broadly drafted, the government was not required to prove anything before the district court except that Alvarez made a false statement about his having received the Congressional Medal of Honor—to which Alvarez pleaded guilty. Accordingly, we know very little about what other evidence the government might have been able to introduce in order to prove that Alvarez's particular statements were unprotected. For instance, some evidence in the record suggests he might have made the false claim at issue, or similar misrepresentations, in order to fraudulently obtain certain benefits.

Medal of Honor, a distinguished-service cross, a Navy cross, an Air Force cross, a silver star, or a Purple Heart. *Id.* § 704(c), (d).

I

**[1]** The Act proscribes false verbal or written representations about one's being awarded Congressionally authorized military honors and decorations. The parties do not dispute that the Act "seek[s] to regulate 'only . . . words.' " *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) (quoting *Gooding v. Wilson*, 405 U.S. 518, 520 (1972)). Moreover, the Act targets words about a specific subject: military honors. The Act is plainly a content-based regulation of speech.

**[2]** Content-based speech restrictions ordinarily are subjected to strict scrutiny. *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000). However, there is an exception to the ordinary rule for "certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942). As explained recently by the Supreme Court in *United States v. Stevens*:

> "From 1791 to the present," . . . the First Amendment has "permitted restrictions upon the content of speech in a few limited areas," and has never "include[d] a freedom to disregard these traditional limitations." These "historic and traditional categories long familiar to the bar[ ]"[ ] includ[e] obscenity, defamation, fraud, incitement, and speech integral to criminal conduct . . . .

130 S. Ct. 1577, 1584 (2010) (internal citations omitted); *see also Chaplinsky*, 315 U.S. at 572 (explaining that unprotected speech includes "the lewd and obscene, the profane,[3] the libel-

---

[3]Since *Chaplinksy*'s list is outdated, *see Cohen v. California,* 403 U.S. 15 (1971) (holding profanity is protected by the First Amendment), we find the current list in *Stevens* to be the most pertinent.

ous, and the insulting or 'fighting' words-those which by their very utterance inflict injury or tend to incite an immediate breach of the peace "); *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) (listing, in defamation case, other low value speech categories as including: "insurrection, contempt, advocacy of unlawful acts, breach of the peace, obscenity, solicitation of legal business" (footnotes omitted)).

The primary argument advanced by the government, and our dissenting colleague, is that the speech targeted by the Act —demonstrably false statements about having received military honors—fits within those "well-defined" and "narrowly limited" classes of speech that are historically unprotected by the First Amendment. The government and the dissent rely on *Gertz v. Robert Welch, Inc.* and its progeny for the proposition that "the erroneous statement of fact is not worthy of constitutional protection." 418 U.S. 323, 340 (1974). In *Gertz*, the Court classified false statements of fact as "belong[ing] to that category of utterances" that " 'are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' " *Id.* at 340 (quoting *Chaplinsky*, 315 U.S. at 572). Thus, the government and the dissent conclude, regulations of false factual speech may be proscribed without constitutional problem—or even any constitutional scrutiny.

We disagree. *Gertz* does not stand for the absolute proposition advocated by the government and the dissent. *See Nike, Inc. v. Kasky*, 539 U.S. 654, 664 (2003) (Stevens, J., concurring in dismissal of writ as improvidently granted) (noting that the Court's statement in *Gertz* that false statements of fact are unprotected speech is "perhaps overbroad[ ]"). Rather, *Gertz*'s statement that false factual speech is unprotected, considered in isolation, omits discussion of essential constitutional qualifications on that proposition.

**[3]** It has long been clear that First Amendment protection does not hinge on the truth of the matter expressed, *see Sulli-*

*van*, 376 U.S. at 271 ("Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth . . . ."), nor does it hinge on the distinction between "facts" and "ideas," *see Nike*, 539 U.S. at 678 (Breyer, J., dissenting from dismissal of writ as improvidently granted ) ("That the [document containing false statements] is factual in content does not argue against First Amendment protection, for facts, sometimes facts alone, will sway our views on issues of public policy."). Although statements characterized by *both* falsity and factualness have never been protected "for [their] own sake," *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 771 (1976), the "First Amendment requires that we protect some falsehood in order to protect speech that matters," *Gertz*, 418 U.S. at 341. As eloquently explained in *Sullivan*,

> [t]o persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and *even to false statement*. But the people of this nation have ordained in the light of history, that, *in spite of the probability of excesses and abuses*, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.
>
> . . . *[E]rroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the breathing space that they need to survive*.

376 U.S. at 271-72 (internal quotation marks and ellipsis omitted) (emphases added). Thus, while some false factual speech may be proscribable, the Supreme Court has shown that not all of it is. We next consider how the distinction is made.

II

We begin by noting our rejection of the government's suggestion that because "[f]alse statements of fact are particularly valueless," *Hustler Magazine v. Falwell*, 485 U.S. 46, 52 (1988), "Congress may prohibit false statements of fact unless immunity has been carved out or should be carved out because the First Amendment requires protection of some falsehood in order to protect speech that matters." In other words, the government contends that there is no protection for false statements of fact unless it can be shown, in a particular case, that there should be.

Contrary to the dissent's view, we cannot adopt the government's approach as the general rule for false factual speech without turning customary First Amendment analysis on its head.

First, under the government's proposed approach, it would effectively become the speaker's burden to prove that his false statement should be protected from criminal prosecution. That approach runs contrary to Supreme Court precedent. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-77 (1986) ("In the context of governmental restriction of speech, it has long been established that the government cannot limit speech protected by the First Amendment without bearing the burden of showing that its restriction is justified."); *see also Sullivan*, 376 U.S. at 271 ("Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth . . . especially one that puts the burden of proving truth on the speaker.").

Second, the government's approach would give it license to interfere significantly with our private and public conversations. Placing the presumption in favor of regulation, as the government and dissent's proposed rule does, would steadily undermine the foundations of the First Amendment. In *Cohen*

*v. California*, the Court rejected state regulation of profanity because "the principle contended for by the State seems inherently boundless. How is one to distinguish this from any other offensive word?" 403 U.S. 15, 25 (1971). This case is to that extent analogous. How, based on the principle proposed by the government, would one distinguish the relative value of lies about one's receipt of a military decoration from the relative value of any other false statement of fact?[4] The government argues that the "protection of false claims of receipt of military honors is not necessary to a free press, to free political expression, or otherwise to promote the marketplace of ideas." But in nearly *every* case, an isolated demonstrably false statement will be not be considered "necessary" to promoting core First Amendment values, and will often be contrary to it. In nearly every case, the false statement will be outweighed by the perceived harm the lie inflicts on the truth-seeking function of the marketplace of ideas. Using such an approach, the government would almost always succeed. However, such an approach is inconsistent with the maintenance of a robust and uninhibited marketplace of ideas. *See Stevens*, 130 S. Ct. at 1585 (explaining that the government's suggestion that "[w]hether a given category of speech enjoys First Amendment protection depends upon a categorical bal-

---

[4]One possible answer to this question is to use the mode of analysis outlined in *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), which holds that even entirely unprotected content cannot be targeted on the basis of viewpoint. Even here, given that one could frame the Congressional intent behind the Act as intending to prevent telling lies that tend to disparage military, concerns about possible viewpoint discrimination may be legitimate. However, laws targeting false statements of *fact*, including this one, are unlikely to *directly* express or relate to an identifiable viewpoint, meaning that the exception in *R.A.V.* for cases in which "there is no realistic possibility that official suppression of *ideas* is afoot," *id.* at 390 (emphasis added), would probably apply. Thus, given the difficulty of identifying the potential viewpoint discrimination afoot in laws targeting false statements about simple, demonstrable facts, we do not rely primarily on *R.A.V.* to sort between permissible and impermissible restrictions on speaking false statements of fact. We acknowledge, however, that *R.A.V.* might help us avoid plunging down a logical slippery slope.

ancing of the value of the speech against its societal costs" is "startling and dangerous"). "The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits." *Id*. The language from *Chaplinsky*, borrowed in *Gertz* to establish that false factual statements are "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality," *Chaplinsky*, 315 U.S. at 572, "do[es] not set forth a test that may be applied as a general matter to permit the Government to imprison any speaker so long as his speech is deemed valueless or unnecessary[.]" *Stevens*, 130 S. Ct. at 1586.[5]

Profanity and deliberately false statements of fact rarely contribute meaningfully to public debate over important issues, but

> [t]he constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended *to remove governmental restraints* from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us . . . .
>
> . . . We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated.

---

[5]Although the dissent denies the proposed rule would result in ad hoc balancing, his own analysis shows that it does. *See* Dissent at p. 11908 (explaining that the Act does not cover speech that matters because "the harm from public officials outright lying to the public on matters of public record should be obvious" and that "our public discourse will not be worse for the loss" caused by chilling "false autobiographical claims by public officials such as Alvarez").

*Cohen*, 403 U.S. at 24-25 (emphasis added).

There is certainly no unbridled constitutional right to lie such that any regulation of lying must be subjected to strict scrutiny. However, the right to speak and write whatever one chooses—including, to some degree, worthless, offensive, and demonstrable untruths—without cowering in fear of a powerful government is, in our view, an essential component of the protection afforded by the First Amendment. The dissent accuses us of confusing rules with exceptions, but with due respect, we disagree with his postulate that we must commence our constitutional analysis with the understanding that all false factual speech is unprotected. The fundamental rule is found in the First Amendment itself: "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Any rule that certain speech is not protected by this foundational principle is the exception, which may in turn be subject to other exceptions to protect against such exceptions swallowing the rule.

In other words, we presumptively protect *all* speech against government interference, leaving it to the government to demonstrate, either through a well-crafted statute or case-specific application, the historical basis for or a compelling need to remove some speech from protection (in this case, for some reason other than the mere fact that it is a lie). Though such an approach may result in protection for a number of lies, which are often nothing more than the "distasteful abuse of [the First Amendment] privilege," *Cohen*, 403 U.S. at 25, it is constitutionally required because the general freedom from government interference with speech, and the general freedom to engage in public and private conversations without the government injecting itself into the discussion as the arbiter of truth, contribute to the "breathing space" the First Amendment needs to survive. *See* Steven G. Gey, *The First Amendment and the Dissemination of Socially Worthless Untruths*, 36 Fla. St. U. L. Rev. 1, 21-22 (2008). "The First Amendment, said Judge Learned Hand, 'presupposes that right con-

clusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all.' " *Sullivan*, 376 U.S. at 270 (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943)). "The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it." *Stevens*, 130 S. Ct. at 1585.

## III

[4] If the speech targeted by the Act is to be declared among those classes of speech which can be prohibited without any constitutional problem (the exceptions to the First Amendment), the speech must fit within those "historical and traditional categories long familiar to the bar." *Id.* at 1584 (internal quotation marks omitted). We find no authority holding that false factual speech, as a general category unto itself, is among them.[6]

## A

[5] *Gertz* involved a libel action by a private citizen against a newspaper for the newspaper's reckless printing of

---

[6]Of course, in the area of commercial speech, the analysis that follows might be very different. Here, there is no suggestion that the Act targets commercial speech, and therefore we do not address commercial speech given the unique way in which it is treated under the First Amendment. However, we are additionally persuaded that upholding the Act would require a novel extension of *Gertz* by the fact that, *even in the context of commercial speech*, knowingly false factual speech about a matter of public concern is potentially entitled to heightened First Amendment scrutiny. *See Nike,* 539 U.S. 654 (dismissing—with a highly fractured Court—certiorari as improvidently granted in a case involving the question of whether false speech with both commercial and public interest aspects is entitled to a degree of First Amendment protection).

an accusation that the plaintiff was a Communist. 418 U.S. at 326-27. The Court began with the "common ground" that "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *Id.* at 339-340 (quoting *Sullivan*, 376 U.S. at 270). But the Court did not end there. Rather, it emphasized that "[a]lthough the erroneous statement of fact is not worthy of constitutional protection, it is nevertheless inevitable in free debate." *Id.* at 340. Therefore, "[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters." *Id.* at 341. To distinguish between the falsehood related to a matter of public concern that is protected and that which is unprotected, *Gertz* held that there must be an element of fault. *Id.* at 347. Indeed, the Court has consistently held that when a speaker publishes a false statement of fact about a matter of public concern, such a statement can be *punished* only upon some showing of *malice* (as opposed to mere negligence),[7] because the malice requirement avoids the potential for punishing speakers who simply make innocent errors. *See Sullivan*, 376 U.S. at 283. The First Amendment is concerned with preventing punishment of innocent mistakes because the prospect of punishment for such speech "runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press." *Gertz*, 418 U.S. at 340. Thus, many false factual statements are shielded by the First Amendment *even under Gertz*, regardless of how valueless they may be. This is emphasized in *Garrison v. Louisiana*, in which the Court clar-

---

[7]A false statement of fact can be punished upon a showing of mere negligence in the context of purely private defamation. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985). Because we take the statements at issue here to be of public concern, and because a violation of the Act calls for the imposition of a criminal penalty on the violator for speaking about a matter of public concern, an element of malice (*at least* reckless disregard for the truth or falsity of the statement) is necessary to its constitutionality, assuming defamation jurisprudence even governs this case.

ified "the *knowingly* false statement . . . do[es] not enjoy constitutional protection." 379 U.S. 64, 75 (1964) (emphasis added); *see also Sullivan*, 376 U.S. at 283.

[6] Moreover, *Garrison*'s clarification is not the only relevant refinement. In defamation jurisprudence, the question has never been simply whether the speech "forfeits [First Amendment] protection by the falsity of some of its factual statements." *Sullivan*, 376 U.S. at 271. The question is always whether the speech forfeits its First Amendment protection as a result of its falsity "*and by its alleged defamation of [the plaintiff]*." *Id.* (emphasis added). In other words, in a defamation case, a threshold question is whether the false speech at issue is *defamatory*, meaning that the defamer's false statement is the proximate cause of an irreparable[8] harm to another's reputation. *See Gertz*, 418 U.S. at 347 (holding that "so long as they do not impose liability without fault, the States may . . . [impose] liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual").

---

[8]On the importance of irreparability, see *infra* pp. 11869, 11879-80. The dissent argues at length that we have conjured up this harm element out of whole cloth, *see* Dissent at p. 11910, but it comes directly from several of the cases about "unprotected" speech. *See, e.g., Chaplinsky*, 315 U.S. at 572 (identifying fighting words as "those which by their very utterance inflict *injury* or tend to incite an immediate breach of the peace") (emphasis added); *Gertz*, 418 U.S. at 347 (describing defamation as "injurious"). We do not mean to suggest, however, that harm is necessarily a required element for *all* unprotected speech regulations (although we find it interesting that it is present in many of them); rather, we note here only that it is a required element of defamation. Defamation, like every "unprotected" category, involves thoughtful and unique definitional analysis, *see infra* n.9. Even obscenity doctrine, which the dissent argues includes no harm element, still requires the statute to define "obscenity" in conformity with the constitutional rule. *See, e.g.*, *Paris Adult Theater I v. Slaton*, 413 U.S. 49 (1973) (reaffirming that obscenity is unprotected, but holding the an anti-obscenity statute must be carefully drafted or construed to meet First Amendment standards). Thus, if defamation law supplies the rule to be applied in this case, we cannot ignore that the definition of defamation includes injury to reputation. *See, e.g., Gertz*, 418 U.S. at 347; *Sullivan*, 376 U.S. at 271; *Dun & Bradstreet*, 472 U.S. at 762.

**[7]** Since the *Stevens* Court saw fit to name defamation specifically, rather than false statements of fact generally, as the historical category excluded from constitutional protection, we believe the historical category of unprotected speech identified in *Gertz* and related law is defamation, not all false factual speech. The dissent erroneously relies on *Gertz* for its statement that false factual speech is valueless and unprotected, while ignoring what *Gertz* actually *held,* and how the Court in *Gertz* framed the issues and carefully analyzed the First Amendment questions raised in the case. Our dissenting colleague does not, because he cannot, provide any citation to relevant authority that follows his suggested approach, in which the Court characterizes a law as targeting false factual speech under the language of *Gertz* and resolves the case in the government's favor without engaging in any First Amendment analysis at all.[9] Unlike our dissenting colleague, we are

---

[9]If Judge Bybee is correct, the opinion in this case would need be no more than a few paragraphs in length. *See* Dissent at pp. 11905-06. Starting with the premise that false statements are unprotected, he believes it therefore follows that the First Amendment presumptively does not apply. He takes one step back to consider briefly whether there is any need to protect the particular false statements targeted by the Act in order to ensure robust political speech, and seeing none, concludes there is no First Amendment issue. The opinion would end there.

Of course, the First Amendment requires more. That is why even in "unprotected" speech cases, the First Amendment analysis is nonetheless rigorous. *See Sullivan*, 376 U.S. at 268 ("Like insurrection, contempt, advocacy of unlawful acts, breach of the peace, obscenity, solicitation of legal business, and the various other formulae for the repression of expression that have been challenged in this Court, libel can claim no talismanic immunity from constitutional limitations. *It must be measured by standards that satisfy the First Amendment*.") (footnotes omitted) (emphasis added); *see also Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (articulating First Amendment test for incitement); *Gooding*, 405 U.S. at 522 (requiring fighting words restrictions to be "carefully drawn"); *Ill. ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 619 (2003) (requiring fraud statute to be properly tailored); *Miller v. California*, 413 U.S. 15, 23-24 (2003) (articulating "carefully limited" test for obscenity regulations); *Virginia v. Black*, 538 U.S. 343 (2003) (engaging in First Amend-

not eager to extend a statement (often quoted, but often quali-
fied) made in the complicated area of defamation jurispru-
dence into a new context in order to justify an unprecedented
and vast exception to First Amendment guarantees.[10] Indeed,

ment analysis to determine test for true threat regulations); *Va. State Bd.
of Pharmacy*, 425 U.S. 748 (applying intermediate scrutiny to commercial
speech). That is also why restrictions on "unprotected" speech are at times
invalidated. *See, e.g., Cohen*, 403 U.S. 15 (rejecting, on First Amendment
grounds, restrictions of profanity); *Gooding*, 405 U.S. 518 (striking down
fighting words statute); *Hustler*, 485 U.S. 46 (prohibiting recovery for
emotional distress in libel action); *Reno v. Am. Civil Liberties Union*, 521
U.S. 844 (1997) (finding portions of Communications Decency Act
invalid under the First Amendment). Thus, even if one agrees with the dis-
sent that *Gertz* and its progeny requires the historical category of unpro-
tected speech at issue here be defined as knowingly false factual speech
per se, that is simply not enough to make the Act immune from First
Amendment analysis. Judge Bybee's approach excepting "some false-
hood" when it is necessary to protecting speech that matters reintroduces
some First Amendment scrutiny into it, but we believe that approach is not
sufficiently speech-protective for the reasons explained *supra* pp.
11859-60. If Judge Bybee is correct, then, we will need an entirely new
constitutional rule for false speech regulations. Rather than guess what
rule the Court would adopt for this newly-broadened category of unpro-
tected speech, we confine our review to previously defined unprotected
categories.

[10]We are not persuaded that *Hoffman v. Capital Cities/ABC, Inc.,* 255
F.3d 1180 (9th Cir. 2001), is anything more than a variation on defamation
jurisprudence. *Hoffman* applied the actual malice standard from *Gertz-
Garrison-Sullivan* in a case involving a magazine's alleged creation of a
false impression that a famous actor posed for a photograph. *Id.* at 1187;
*cf. also Time, Inc. v. Hill*, 385 U.S. 374 (1967) (holding constitutional a
state law imposing civil liability for malicious false statements that invade
a private individual's right of privacy). Although the asserted injury in
*Hoffman* is not to reputation, but instead to a form of publicity rights, the
interests at stake are sufficiently similar to defamation that the *Gertz-
Garrison-Sullivan* framework can conceptually apply without a significant
extension of the doctrine. When the only asserted injury is to the reputa-
tion of a *government institution*, the historical basis for finding that the
"social interest in order and morality" outweighs the value of precluding
government interference with speech is absent. *Chaplinsky*, 315 U.S. at
571-72; *see Gertz*, 418 U.S. at 341 ("The need to avoid self-censorship by

*Stevens* instructs us not to do so: "Our decisions [following *Chaplinksy*] cannot be taken as establishing a freewheeling authority to declare new categories of speech outside the scope of the First Amendment." 130 S. Ct. at 1586.

**[8]** With this constitutional background in mind, we next consider whether the Act fits into the defamation category. We assume that receipt of military decorations is a matter of public concern, as it primarily involves Congressional and military recognition of public service. The Act, however, does not require a malicious violation, nor does it contain any other requirement or element of scienter (collectively, a scienter requirement). Without a scienter requirement to limit the Act's application, the statute raises serious constitutional concerns under defamation jurisprudence because the First Amendment clearly prohibits criminally punishing negligent speech about matters of public concern. *See Gertz*, 418 U.S. at 340, 347.

To avoid such a result, the government preemptively suggested at oral argument that a scienter requirement can be read into the Act. Adopting the government's suggestion (even though the Act presently includes no express scienter element) would require us to construe the Act to include a requirement that the government prove that the defendant spoke with malice. *See Staples v. United States*, 511 U.S. 600, 604-06 (1994); *Osborne v. Ohio*, 495 U.S. 103, 115 (1990). If a scienter requirement would save the statute, we would be obliged to read it in if possible. *See Gray v. First Winthrop Corp.*, 989 F.2d 1564, 1568 (9th Cir. 1993). Such an approach might be reasonable since most people know the truth about themselves, thereby permitting us to construe the Act to

the news media *is . . . not the only societal value at issue*. If it were, this Court would have embraced long ago the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation.") (emphasis added).

require a knowing violation. Indeed, the government charged Alvarez with *knowingly* making the false statement.

But that is not enough. The Court has never held that a person can be liable for defamation merely for spreading knowingly false statements. The speech must also be "injurious to a private individual." *Gertz*, 418 U.S. at 347.

Of course, if we look beyond the text of the Act, there is a presumptive harm identified by Congress that might be analogized to the presumption of reputational harm made in defamation cases. Specifically, Congress made "Findings" that "fraudulent claims" about receipt of military honors "damage the reputation and meaning of such decorations and medals." Stolen Valor Act of 2005, Pub. L. No. 109-437, § 2(1), 120 Stat. at 3266; *see also* 151 Cong. Rec. S12684-01, S12688-99 (2005) (statement of Sen. Conrad). We do not believe the "Findings" make this a defamation statute.

First, while the "Findings" identify the injury the Act targets, they do not actually limit the *application* of the Act. There is no requirement in the Act that the government bear the burden to prove that the defendant's speech or writing proximately caused damage to the reputation and meaning of military decorations and medals. Although common law traditions suggest that we can sometimes presume damage in defamation cases, *see Gertz*, 418 U.S. at 349-50, there is no readily apparent reason for assuming, without specific proof, that the reputation and meaning of military decorations is harmed every time someone lies about having received one. To the contrary, the most obvious reason people lie about receiving military honors is because they believe that their being perceived as recipients of such honors brings them acclaim, suggesting that generally the integrity and reputation of such honors remain unimpaired. And notably, even in defamation cases, a "publication" is required, ensuring that liability attaches only to those falsehoods spoken under circumstances in which the harm could result. In this case,

however, we cannot ignore the fact that *nothing* in the Act requires a showing of either (1) publicity or (2) victims. Alvarez made his statement in a water district board meeting; it would have made no difference under the Act if he had he made the statement in the privacy of his home at a family dinner.

More importantly, even if it were justifiable to presume that harm to the meaning and reputation of military decorations occurs whenever a false claim concerning their receipt or possession is made, the government may not restrict speech as a means of self-preservation. The right against defamation belongs to natural persons, not to governmental institutions or symbols. *See Sullivan*, 376 U.S. at 291 (" '[N]o court of last resort in this country has ever held, or even suggested, that prosecutions for libel *on government* have any place in the American system of jurisprudence.' " (quoting *City of Chicago v. Tribune Co.*, 139 N.E. 86, 88 (Ill. 1923)) (emphasis added)). Preserving the value of military decorations is unquestionably an appropriate and worthy governmental objective that Congress may achieve through, for example, publicizing the names of legitimate recipients or false claimants,[11] creating educational programs, prohibiting the act of posing as a veteran to obtain certain benefits, or otherwise more carefully circumscribing what is required to violate the Act. But the First Amendment does not permit the government to pursue this sort of objective by means of a pure speech regulation like the one contained in the Act. *See Texas v. Johnson*, 491 U.S. 397, 418-20 (1989) ("To say that the government has an interest in encouraging proper treatment of the flag, however, is not to say that it may criminally punish a person for burning a flag as a means of political protest.");

---

[11]Indeed, Congress and other organizations already make such lists publicly available. *See* Congressional Medal of Honor Society, Recipients, http://www.cmohs.org (last accessed Mar. 31, 2010); Congressional Medal of Honor Foundation, http://www.cmohfoundation.org (last accessed Mar. 31, 2010).

*see also Schacht v. United States*, 398 U.S. 58, 63 (1970) ("An actor, like everyone else in our country, enjoys a constitutional right to freedom of speech, including the right openly to criticize the Government during a dramatic performance. The last clause of [18 U.S.C. § 772(f)] denies this constitutional right to an actor who is wearing a military uniform by making it a crime for him to say things that tend to bring the military into discredit and disrepute.").

Finally, even assuming the Act prevents a harm legitimately preventable by means of a speech or writing restriction, to say that the Act in its current form fits within defamation doctrine would require us to ignore the *nature* of the harm against which the defamation law is intended to protect. A victim's right to recovery for defamation trumps the defamer's First Amendment interests because, when it comes to *defamatory* falsehoods, "the truth rarely catches up with a lie" so the "opportunity for rebuttal seldom suffices to undo harm." *Gertz*, 418 U.S. at 344 n.9; *see also Hustler*, 485 U.S. at 52 (explaining that defamatory falsehoods "cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective"). The harm caused by defamation is thought to be *irreparable* even when the truth is brought to light. Here, in contrast, when someone falsely claims to have been awarded a Congressionally-authorized medal, and his or her false claims are exposed as self-aggrandizing lies, scandal results, and counter-speech can vindicate the truth in a way the law presumes rebuttal of defamatory falsehoods cannot. Indeed, Alvarez was perceived as a phony even before the FBI began investigating him, and he has since been publicly humiliated in his community and in the press (one online article described him as an "idiot," and another post described him as a "jerk"). When valueless false speech, even proscribable speech, can best be checked with *more* speech, a law criminalizing the speech is inconsistent with the principles underlying the First Amendment. *See infra* pp. 11879-80.

**[9]** Thus, the Act is not sufficiently analogous to an anti-defamation law to bring it within the scope of the historical First Amendment exception for laws punishing defamation.

B

**[10]** Moving beyond defamation, there are other of the historical categories that may involve false factual speech—fraud and, to a certain extent, speech that is integral to criminal conduct. It is obvious, however, that these categories also include limiting characteristics to what speech may be proscribed beyond mere falsity, just as defamation law does.

**[11]** Fraud statutes must be precisely crafted to target only specific false statements that are likely to cause a bona fide harm.

> [I]n a properly tailored fraud action the State bears the full burden of proof. False statement alone does not subject a [speaker] to fraud liability. . . . [T]o prove a defendant liable for fraud, the complainant must show that the defendant made a false representation of a material fact knowing that the representation was false; further, the complainant must demonstrate that the defendant made the representation with the intent to mislead the listener, and succeeded in doing so.

*Ill. ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 620 (2003).

**[12]** Even laws about perjury or fraudulent administrative filings—arguably the purest regulations of false statements of fact—require at a minimum that the misrepresentation be willful, material, and uttered under circumstances in which the misrepresentation is designed to cause an injury, either to the proper functioning of government (when one is under an affirmative obligation of honesty) or to the government's or

a private person's economic interests. *See, e.g.*, *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) ("A witness testifying under oath or affirmation violates [the perjury statute, 18 U.S.C. § 1621] if she gives false testimony concerning a *material matter* with the *willful intent* to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." (emphases added)); 18 U.S.C. § 1035 (prohibiting *knowing and willful*, *material* false statements made *to obtain health care benefits*). Into this area of the law we would also place *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1262 (9th Cir. 1982) (holding that the First Amendment does not protect *deliberately* misrepresenting facts *to an administrative body* for *anticompetitive purposes* ").[12] Thus, falsity alone is not enough. The context must be well-defined.

In addition, impersonation statutes are drafted to apply narrowly to conduct performed in order to obtain, at a cost to another, a benefit to which one is not entitled. *See* 18 U.S.C. § 912 ("Whoever falsely *assumes or pretends* to be an officer

---

[12]*Clipper Exxpress* supports the cautionary holding we reach today. In that case, we explained:

> The first amendment has not been interpreted to preclude liability for false statements. For example, defamatory statements can be made the basis for liability. 18 U.S.C. § 1001 imposes criminal penalties for knowingly and wilfully concealing or misrepresenting material facts before any department or agency of the United States. Courts uniformly punish perjury. As the Supreme Court stated in [*Gertz*, 418 U.S. at 340], "there is no constitutional value in false statements of fact." Contrary to defendants' assertions, there is simply no basis to hold that deliberately misrepresenting facts to an administrative body for anticompetitive purposes enjoys blanket first amendment protection.

690 F.2d at 1261-62. We read *Clipper Exxpress* to explain, as we have done herein, that although false factual speech is not protected for its own sake such that the First Amendment precludes its prosecution, laws prohibiting it must nonetheless target well-defined subsets of speech like defamation or fraud or other clearly-defined criminal conduct.

or employee acting under the authority of the United States or any department, agency or officer thereof, and acts as such, or *in such pretended character demands or obtains any money*, paper, document, or thing of value, shall be fined under this title or imprisoned not more than three years, or both." (emphases added)).

**[13]** Since Congress apparently intended the Act to be used to stop fraud, comparing the Act to fraud laws strikingly illustrates the Act's infirmities. In a "properly tailored fraud action" "[f]alse statement alone does not subject a [speaker] to fraud liability." *Ill. ex rel. Madigan*, 538 U.S. at 620. Rather, there must be proof the false statement was (1) knowing and intended to mislead, (2) material, and (3) did mislead. *Id.* The Act, even were we to read a "knowingly" element into it, *see supra* pp. 11866, still lacks the critical materiality, intent to defraud, and injury elements. Indeed, Alvarez pleaded guilty simply to making a knowingly false statement. The government was not require to allege that the statement was material, intended to mislead, or most critically, *did* mislead the listener. Rather, the record here shows, if anything, Alvarez has no credibility whatsoever and that no one detrimentally relied on his false statement. Although we believe that Congress could revisit the Act to modify it into a properly tailored fraud statute, we are not permitted to suggest how it could be done, since such would be a " 'serious invasion of the legislative domain.' " *Stevens*, 130 S. Ct. at 1592 (quoting *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 479 n.26 (1995)). Accordingly, we cannot construe the Act as falling within the historical First Amendment exception for anti-fraud laws.

**[14]** Somewhat relatedly, criminal conduct is not immunized "merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). Thus, laws focused on criminal conduct—like perjury or tax or administrative fraud or imper-

sonating an officer—raise no constitutional concerns even though they can be violated by means of speech. Unlike such uncontroversial criminal laws, however, the Act makes criminal the speech itself *regardless of any defining context* that assures us the law targets legitimately criminal conduct.[13] Here again, Alvarez was not prosecuted for impersonating a military officer, or lying under oath, or making false statements in order to unlawfully obtain benefits. There was not even a requirement the government prove he intended to mislead. He was prosecuted simply for saying something that was not true. Without any element requiring the speech to be related to criminal conduct, this historical exception from the First Amendment does not apply to the Act as drafted.

## C

In sum, our review of pertinent case law convinces us that the historical and traditional categories of unprotected false factual speech have thus far included only certain *subsets* of false factual statements, carefully defined to target behavior that is most properly characterized as fraudulent, dangerous, or injurious conduct, and not as pure speech. We are aware of no authority holding that the government may, through a criminal law, prohibit speech *simply* because it is knowingly factually false.

Precedent makes clear that knowing factual error is insufficient "to remove the constitutional shield from criticism of official conduct." *Sullivan*, 376 U.S. at 273. Hence the historical rejection of the validity of the Alien and Sedition Act, which "made it a crime, punishable by a $5,000 fine and five

---

[13]While it may seem unlikely anything but the most egregious violations of the Act would be prosecuted, we do not determine the constitutionality of the Act based on our assumptions of how prosecutors will, in their discretion, enforce it. *See Stevens*, 130 S. Ct. at 1591 ("[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").

years in prison, 'if any person shall write, print, utter or publish . . . any false, scandalous and malicious writing or writings against the government of the United States, or either house of the Congress . . . , or the President . . . with intent to defame . . . or to bring them, or either of them, into contempt or disrepute; or to excite against them, or either or any of them, the hatred of the good people of the United States.' " *Id.* at 273-34 (quoting Sedition Act of 1798, 1 Stat. 596). Thus, even though some knowing false statements may be proscribed, that proscription cannot be universal.

Moreover, there can be no doubt that there is affirmative constitutional value in at least some knowingly false statements of fact. Satirical entertainment such as The Onion, The Daily Show, and The Colbert Report thrives on making deliberate false statements of fact. Such media outlets play a significant role in inviting citizens alienated by mainstream news media into meaningful public debate over economic, military, political and social issues. However, even if such satirical writings and shows did not invite attention to and comment about issues of "public importance," would anyone with even a rudimentary knowledge of First Amendment law seriously argue that the satirical, false statements frequently contained in such writing and programming are categorically outside First Amendment protection? *See Sullivan*, 376 U.S. at 279 n.19 ("Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collision with error.' " (quoting John Stuart Mill, On Liberty 15 (Oxford: Blackwell 1947))). Further, whether it be method actors getting into character, satirists being ironic or sarcastic, poets using hyperbole, or authors crafting a story, creative persons often make factual statements or assertions which, as they are fully aware, are entirely untrue. Such creative uses of knowingly false speech are highly protected. *Cf. Miller v. California*, 413 U.S. 15, 24 (1973) (requiring obscenity statutes to apply only to works that "taken as a

whole, do not have serious literary, artistic, political, or scientific value").

**[15]** Thus, false factual speech as a general category is not, and cannot be, proscribed under threat of criminal prosecution. Although certain subsets of false factual speech have been declared unprotected, such classes of speech were developed as the result of thoughtful constitutional analysis of what other characteristics the speech must have before it can be proscribed without clashing with First Amendment protections. The Act does not fit neatly into any of those "well-defined" and "narrowly limited" classes of speech previously considered unprotected, and we thus are required to apply the highest level of scrutiny in our analysis.

IV

Before performing the customary First Amendment analysis, however, we consider alternatively what may perhaps be better authority for the view that the maliciously stated false factual speech is historically unprotected— not *Gertz* and the unique universe of defamation jurisprudence, or the law of fraud, but *Schenck v. United States*, as suggested by Alvarez in his appeal. There, Justice Holmes famously noted that "[t]he most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic." 249 U.S. 47, 52 (1919). Although *Schenck* was concerned with seditious speech, it is particularly instructive here, given that the "clear and present danger" test emerged from the "fire in a theater" hypothetical, which is quintessentially about a false statement of fact.

Generalizing from the "fire in a theater" hypothetical, Justice Holmes went on to hold that "[t]he question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and

degree." *Id.* (emphasis added). To the extent we are even free to look beyond defamation and fraud for a more general rule concerning prohibition of false factual speech, we agree with Alvarez that the rule from *Schenck* might supply a helpful guideline for defining the relevant subset of false speech that is historically unprotected.[14] Indeed, *Schenck*'s requirements that any restricted speech be uttered under circumstances likely to be the proximate cause of an imminent harm within the scope of Congress' legitimate reach are highly relevant to the classes of false factual speech we have already identified —defamation, fraud, and speech integral to criminal conduct —and other classes of speech historically held to be unworthy of constitutional protection. *See, e.g.*, *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is *directed to inciting or producing imminent lawless action* and *is likely to incite or produce such action*." (emphases added)); *Virginia v. Black*, 538 U.S. 343, 360, 363 (2003) (permitting prohibition of "cross burnings done with the intent to intimidate" because "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker *directs a threat to a person . . . with the intent of placing the victim in fear* of bodily harm or death" (emphases added)); *Chaplinsky*,

---

[14]The "clear and present danger" rule has long been criticized as being insufficiently protective of First Amendment freedoms when it comes to seditious and some other forms of speech. *See* Thomas I. Emerson, *Toward a General Theory of the First Amendment*, 72 Yale L.J. 877, 910-12 (1963). Indeed, the holding of *Schenck* itself, in which the Court upheld a prosecution for discouraging military enlistment, was accompanied by a strong dissent. However, our purpose here is only to articulate minimum requirements that must be met before a false statement of fact can be removed from First Amendment protection under existing precedents. Some false statements of fact made with scienter and likely to cause a real harm might nonetheless deserve constitutional protection, such as the sort of malicious false speech targeted by the Alien and Sedition Act, *see infra* p. 11873-74. In such a case, additional First Amendment scrutiny would obviously be required.

315 U.S. at 573 ("It is a statute narrowly drawn and limited to define and punish specific conduct lying within the domain of state power, *the use in a public place* of words *likely to cause a breach of the peace*." (emphasis added)).

Following *Schenck*, then, we might articulate the class of false factual speech unprotected by the First Amendment to be that false factual speech which creates a clear and present danger of a harm Congress has a right to prevent. Assuming that the "clear and present danger" test is the more appropriate rule, as Alvarez urges us to do, we agree with him that the Act fails the test for the same reasons the Act is not analogous to anti-defamation laws.

As explained in *Schenck*, the power of the government to punish such speech involves careful consideration of "proximity and degree" of the harm. For the reasons already substantially described *supra* in Part III.A, the speech targeted by the Act does not pose any immediate and irreparable harm; any harm it does cause can be remedied by more speech. Further, the harm the Act identifies—damage to the reputation and meaning of military honors—is not the sort of harm we are convinced Congress has a legitimate right to prevent by means of restricting speech.

V

Having concluded that the Act does not fit within the traditional categories of speech excluded from First Amendment protection, we must subject it to strict scrutiny review. Indeed,

> [e]ven as to [the narrowly limited classes of speech noted in *Chaplinsky*] . . . because the line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn . . . the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom[.] In other

> words, the statute must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression. Because First Amendment freedoms need breathing space to survive, government may regulate the area only with narrow specificity.

*Gooding,* 405 U.S. at 522 (internal quotation marks and citations omitted) (emphases added); *see also Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997) (explaining that the First Amendment requires that statutes targeting the content of speech must be drafted with "precision"). The Court has always carefully considered the contours of regulations purporting to target "unprotected" speech; here, being unconvinced the Act even targets such "unprotected" speech, we are even more mindful of our obligation to ensure the statute is narrowly drawn.

**[16]** The strict scrutiny standard of review is familiar: the government must show that the law is narrowly tailored to achieve a compelling governmental interest. *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 898 (2010). A law is not narrowly tailored when less speech-restrictive means exist to achieve the interest. *See Reno*, 521 U.S. at 874 (holding that although adult content is unprotected as to children, it is protected as to adults, so a law imposing a "burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve"). Even the dissent agrees that the Act fails strict scrutiny. Dissent at n.10.

**[17]** The asserted governmental interest at issue in the Act is to prevent "fraudulent claims" about receipt of military honors, such claims causing "damage the reputation and meaning of such decorations and medals." Stolen Valor Act of 2005, Pub. L. No. 109-437, § 2(1), 120 Stat. at 3266; *see also* 151 Cong. Rec. S12684-01, S12688-99 (2005) (statement of Sen. Conrad). The government argues that the referenced

interest is important to motivating our military. Especially at a time in which our nation is engaged in the longest war in its history, Congress certainly has an interest, even a compelling interest, in preserving the integrity of its system of honoring our military men and women for their service and, at times, their sacrifice.

**[18]** However, the government has not proven here that the speech restriction is a narrowly tailored means of achieving that noble interest. In *Brown v. Hartlage*, the Supreme Court explained,

> Although the state interest in protecting the political process from distortions caused by untrue and inaccurate speech [or, in this case, the state interest in protecting the integrity of our national military decoration system] is somewhat different from the state interest in protecting individuals from defamatory falsehoods, the principles underlying the First Amendment remain paramount. Whenever compatible with the underlying interests at stake, under the regime of that Amendment "we depend for . . . correction not on the conscience of judges and juries but on the competition of other ideas." In a political campaign, a candidate's factual blunder is unlikely to escape the notice of, and correction by, the erring candidate's political opponent. The preferred First Amendment remedy of "more speech, not enforced silence," thus has special force.

456 U.S. 45, 61 (1982) (quoting *Gertz*, 418 U.S. at 339-40, and *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)) (ellipses in original). Here, Alvarez's lie, deliberate and despicable as it may have been, did not escape notice and correction in the marketplace. The preferred First Amendment remedy of "more speech" thus was available to repair any harm. *See also Johnson*, 491 U.S. at 419 (" '[N]o danger flowing from speech can be deemed clear and present,

unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion. If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence.' " (quoting *Whitney*, 274 U.S. at 377 (Brandeis, J., concurring))).

**[19]** On this record it is speculative at best to conclude that criminally-punishing lies about having received Congressionally-awarded medals is the best and only way to ensure the integrity of such medals—after all, it seems just as likely that the reputation and meaning of such medals is wholly unaffected by those who lie about having received them. The greatest damage done seems to be to the reputations of the liars themselves. *See supra* p. 11869; *see also United States v. Hinskon*, ___ F.3d ___, 2010 WL 2757419, at *17 (9th Cir. Jul. 14, 2010) (W. Fletcher, J., dissenting from denial of en banc panel rehearing) (arguing that witness' credibility would have been impeached had his lie about having received a Purple Heart been exposed to the jury). Further, even assuming that there is general harm to the meaning of military honors caused by numerous imposters, other means exist to achieve the interest of stopping such fraud, such as by using *more* speech, or redrafting the Act to target actual impersonation or fraud. *See supra* p. 11870-72.

Further, we agree with the reasoning of the District Court of Colorado, that suggesting "that the battlefield heroism of our servicemen and women is motivated in any way . . . by considerations of whether a medal may be awarded simply defies . . . comprehension" and is "unintentionally insulting to the profound sacrifices of military personnel the Stolen Valor Act purports to honor." *United States v. Strandlof,* No. 09-cr-00497-REB, ___ F. Supp. 2d ___, 2010 WL 2802691 (D. Colo. Jul. 16, 2010). Even if we were to make the unfounded assumption that our troops perform their riskiest missions in the hope of receiving the Medal of Honor, there is no

evidence—nor any reasonable basis for assuming—that some people's false claims to have received the medal has a de-motivating impact on our men and women in uniform.

**[20]** In sum, honoring and motivating our troops are doubt-less important governmental interests, but we fail to see how the Act is necessary to achieving either aim. Accordingly, we hold that the Act is not narrowly tailored to achieve a compel-ling governmental interest. As presently drafted, the Act is facially invalid under the First Amendment, and was uncon-stitutionally applied to make a criminal out of a man who was proven to be nothing more than a liar, without more.[15]

We have no doubt that society would be better off if Alva-rez would stop spreading worthless, ridiculous, and offensive untruths. But, given our historical skepticism of permitting the government to police the line between truth and falsity, and between valuable speech and drivel, we presumptively protect all speech, including false statements, in order that clearly protected speech may flower in the shelter of the First Amendment. The government has not rebutted that presump-tion here because the Act is not sufficiently analogous to tra-ditional permissible restrictions on false speech.

## CONCLUSION

In order to advance Congress's praiseworthy efforts to stop fraudulent claims about having received Congressionally authorized military honors, the government would have us extend inapposite case law to create an unprecedented excep-tion to First Amendment guarantees. We decline to follow

---

[15]Judge Bybee emphasizes our failure to identify any other unconstitu-tional applications of the Act. Of course, we cannot identify other invalid applications because Alvarez's prosecution is the first case brought under the Act in its current form. The second prosecution we know of, *United States v. Strandlof*, No. 09-cr-00497-REB, ___ F. Supp. 2d ___, 2010 WL 2802691, ended in the defendant's favor, with the district court holding the Act unconstitutional for substantially the same reasons we do.

such a course, and hold that the Act lacks the elements that would make it analogous to the other restrictions on false speech previously held to be proscribable without constitutional problem. Accordingly, we hold that the Act is not narrowly drawn to achieve a compelling governmental interest, and is unconstitutional.

REVERSED. The case is REMANDED to the district court for proceedings consistent with this opinion.

---

BYBEE, Circuit Judge, dissenting:

Xavier Alvarez, a California public official, stood in a public meeting and announced that he was a retired Marine, a wounded veteran, and the recipient of the Congressional Medal of Honor. Alvarez was lying on all counts. He pleaded guilty to violating the Stolen Valor Act of 2005 ("Act"), which punishes a person who "falsely represents himself or herself, verbally or in writing, to have been awarded any decoration or medal authorized by Congress for the Armed Forces of the United States." 18 U.S.C. § 704(b). He now challenges his conviction on First Amendment grounds.

In its recent decision in *United States v. Stevens*, 130 S. Ct. 1577 (2010), the Supreme Court reminded us that there are "categories of speech . . . fully outside the protection of the First Amendment." *Id.* at 1586. As to these categories—which the Court labeled "historic and traditional categories long familiar to the bar"—"the First Amendment has permitted restrictions upon the content of speech." *Id.* at 1584 (quotation marks omitted).

For more than six decades, the Court has recognized that "false statements of fact . . . belong to th[e] category of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any

benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' " *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)). The Court has stated as plain as words permit that "the erroneous statement of fact is not worthy of constitutional protection." *Id.*; *see also BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 531 (2002) ("[F]alse statements [are] unprotected for their own sake."); *Hustler Magazine v. Falwell*, 485 U.S. 46, 52 (1988) ("False statements of fact are particularly valueless; they interfere with the truth-seeking function of the marketplace of ideas . . . ."); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776 (1984) (false statements of fact have "no constitutional value" because they "harm both the subject of the falsehood *and* the readers of the statement" (quotation marks omitted)); *Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 743 (1983) ("[F]alse statements are not immunized by the First Amendment right to freedom of speech."); *Herbert v. Lando*, 441 U.S. 153, 171 (1979) ("Spreading false information in and of itself carries no First Amendment credentials."). False statements are unprotected by the First Amendment except in a limited set of contexts where such protection is necessary "to protect speech that matters," *Gertz*, 418 U.S. at 341, such as "expression critical of the official conduct of public officials," *New York Times Co. v. Sullivan*, 376 U.S. 254, 268 (1964). And even in these special contexts, "the *knowingly* false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection." *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964) (emphasis added).

Despite the clarity and consistency of the Supreme Court's insistence that false statements of fact (or "false statements") generally fall outside First Amendment protection, the majority somehow manages to "find *no authority* holding that false factual speech, as a general category unto itself, is among [the historically unprotected classes of speech]," Maj. Op. at 11861 (emphasis added), and concludes that "we presumptively protect . . . false statements," *id.* at 11881. The majority

then moves from this faulty principle to an even more remarkable one: after repeating the Court's statement in *Garrison* that " 'the *knowingly* false statement . . . do[es] not enjoy constitutional protection,' " Maj. Op. at 11863 (alteration and ellipsis in original) (quoting *Garrison*, 379 U.S. at 75), the majority holds that Alvarez's *knowingly* false statement of fact is entitled to *full* constitutional protection, and therefore that the court is "required to apply the highest level of scrutiny in [its] analysis" of the Act, *id.* at 37; *see also id.* at 3 ("[R]egulations of false factual speech must . . . be subjected to strict scrutiny . . . ."). Standing on these startling premises, the majority delivers its final blow: the Act fails strict scrutiny and is thus unconstitutional not only as applied to Alvarez, but in all its applications. *See id.* at 45-46.

I would hold that the Act is constitutional as applied to Alvarez and that the Act is not unconstitutionally overbroad. Because the majority has rewritten established First Amendment law, I respectfully dissent.

I

Before turning to Alvarez's as-applied and facial challenges and the majority's errors with respect to the particular elements of this case, I am going to begin by discussing the First Amendment framework under which the Supreme Court analyzes false statements of fact, which involves a general rule and a series of exceptions. I then explain why I think the majority has misread the cases and, in the process, turned the exceptions into the rule and the rule into an exception.

A

The First Amendment states, in relevant part: "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. CONST. amend. I. "As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its

content." *United States v. Stevens*, 130 S. Ct. 1577, 1584 (2010) (alteration and quotation marks omitted) (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002)). A content-based restriction of constitutionally protected speech "can stand only if it satisfies strict scrutiny," *United States v. Playboy Ent. Group, Inc.*, 529 U.S. 803, 813 (2000), meaning that it "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end," *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

But not all speech is entitled to First Amendment protection. Rather, "[t]here are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem" because "such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942). Included among these "classes of speech" are "obscenity, defamation, fraud, incitement, and speech integral to criminal conduct." *Stevens*, 130 S. Ct. at 1584 (citations omitted); *see also Chaplinsky*, 315 U.S. at 572.

"Defamation" as a class of speech falls within the unprotected category of speech that the Court has referred to as "false statements of fact." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974). In *Gertz*, the Court explained the difference between false statements of fact and false ideas: "Under the First Amendment there is no such thing as a false idea. . . . But there is no constitutional value in false statements of fact." *Id.* at 339-40. It then held that "the erroneous statement of fact is not worthy of constitutional protection." *Id.* at 340. The Supreme Court has regularly repeated, both inside and outside of the defamation context, that false statements of fact are valueless and generally not within the protection of the First Amendment. *See, e.g.*, *BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 531 (2002) ("[F]alse statements [are] unpro-

tected for their own sake."); *Hustler Magazine v. Falwell*, 485 U.S. 46, 52 (1988) ("False statements of fact are particularly valueless; they interfere with the truth-seeking function of the marketplace of ideas . . . ."); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776 (1984) (false statements of fact have "no constitutional value" because they "harm both the subject of the falsehood *and* the readers of the statement" (quotation marks omitted)); *Bill Johnson's Rest., Inc. v. N.L.R.B.*, 461 U.S. 731, 743 (1983) ("[F]alse statements are not immunized by the First Amendment right to freedom of speech."); *Herbert v. Lando*, 441 U.S. 153, 171 (1979) ("Spreading false information in and of itself carries no First Amendment credentials."); *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 499 n.3 (1975) (Powell, J., concurring) ("[T]he First Amendment affords no constitutional protection for false statements of fact."). Because false statements of fact do not enjoy the protection of the First Amendment, such statements may ordinarily be regulated by the government. Congress, for example, has provided criminal penalties for any number of false statements of fact uttered in a variety of contexts. *See, e.g.*, 18 U.S.C. pt. I, ch. 47 *passim* ("Fraud and false statements").

Thus, the general rule is that false statements of fact are not protected by the First Amendment.[1] There is, however, an

---

[1] The majority disagrees with my characterization of *Gertz*'s principle as a "general rule" and of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and its progeny as "exceptions." The majority argues that "[t]he fundamental rule is found in the First Amendment itself: 'Congress shall make no law . . . abridging the freedom of speech.' " Maj. Op. at 11860 (ellipsis in original) (quoting U.S. CONST. amend. I). Thus, the majority continues, "[a]ny rule that certain speech is not protected by this foundational principle is the exception, which may in turn be subject to other exceptions to protect against such exceptions swallowing the rule." *Id.*

The majority has misunderstood the concept of unprotected speech. It is not true, as the majority states, that "we presumptively protect *all* speech against government interference." *Id.* The First Amendment does not protect all "speech" but rather "the freedom of speech," which *does not include* those categories of speech traditionally considered outside of

important exception to this principle: where protecting a false statement is necessary "in order to protect speech that matters." *Gertz*, 418 U.S. at 341; *see also BE & K*, 536 U.S. at 531 ("[W]hile false statements may be unprotected for their own sake, '[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters.' " (emphasis omitted) (second alteration in original) (quoting *Gertz*, 418 U.S. at 341)). In *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), the seminal case in this area, the Court extended limited First Amendment protection to libelous statements "critical of the official conduct of public officials." *Id.* at 268. Because "erroneous statement is inevitable in free debate, and . . . must be protected if the freedoms of expression are to have the 'breathing space' that they 'need to survive,' " the Court feared that permitting public officials to bring tort claims against their critics based on a false statement of fact would "lead[ ] to . . . 'self-censorship,' " deterring such critics "from voicing their criticism[ ] even though it is believed to be true and even though it is in fact true." *Id.* at 271-72, 279 (ellipsis omitted). In order to protect against such "self-censorship," the Court adopted "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard

---

First Amendment protection. *See* John Paul Stevens, *The Freedom of Speech*, 102 YALE L. J. 1293, 1296 (1993) ("I emphasize the word 'the' as used in the term 'the freedom of speech' because the definite article suggests that the draftsmen intended to immunize a *previously identified category or subset of speech.* That category could not have been co-extensive with the category of oral communications that are commonly described as 'speech' in ordinary usage. . . . The Amendment has never been understood to protect all oral communication." (emphasis added)). Thus, the lack of protection afforded false statements of fact is no more of an "exception" to the First Amendment than the lack of First Amendment protection afforded the pulling of a gun trigger. Neither of these activities is considered *part of* "the freedom of speech," so neither should be characterized as an *exception* to the First Amendment.

of whether it was false or not." *Id.* at 279-80. The Court has extended the *New York Times* "actual malice" rule to "public figures" even if they are not "public officials," *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 155 (1967), but has "refus[ed] to extend the *New York Times* privilege to defamation of private individuals," even with respect to matters of public concern, *Gertz*, 418 U.S. at 351.[2]

Consistent with the principle set forth in *New York Times*, the Court held, in *Garrison v. Louisiana*, 379 U.S. 64 (1964), that "the *knowingly* false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection." *Id.* at 75 (emphasis added); *see also id.* ("Calculated falsehood falls into that class of utterances which 'are no essential part of any exposition of ideas . . . .' " (quoting *Chaplinsky*, 315 U.S. at 572)). In *Gertz*, the Court confirmed that knowing lies are excluded from the limited First Amendment protection *New York Times* established for false statements of fact: "[T]he intentional lie . . . [does not] materially advance[ ] society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *Gertz*, 418 U.S. at 340 (quoting *New York Times*, 376 U.S. at 270). Although *Garrison* and *Gertz* both involved defamation, the Supreme Court and our court have extended *Garrison*'s rule beyond the defamation context, as will be discussed in Part I.B.2.

There is, however, an important caveat to the principle that knowingly false statements of fact are not entitled to constitutional protection. *See* Maj. Op. at 11874. The Court has recognized that some statements that, literally read, are technically "knowingly false" may be "no more than rhetorical hyperbole," *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14

---

[2]Although the Court in *Gertz* "allow[ed] the States to impose liability on the publisher or broadcaster of defamatory falsehood on a less demanding showing than that required by *New York Times*," the Court held that damages are limited to "compensation for actual injury." *Gertz*, 418 U.S. at 348-49.

(1970), or "lusty and imaginative expression," *Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 286 (1974), such as satire or fiction. In *Hustler*, the Supreme Court held that the First Amendment protects defamatory statements about a public figure "that could not reasonably have been interpreted as stating actual facts about the public figure involved." 485 U.S. at 50. And in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990), the Court clarified that such protection "provides assurance that public debate will not suffer for lack of imaginative expression or the rhetorical hyperbole which has traditionally added much to the discourse of our Nation." *Id.* at 20 (quotation marks omitted)); *see also Knievel v. ESPN*, 393 F.3d 1068, 1074 (9th Cir. 2005) (stating that "[t]he First Amendment protects statements that cannot reasonably [be] interpreted as stating actual facts about an individual" because of "the reality that exaggeration and non-literal commentary have become an integral part of social discourse" (quotation marks omitted) (second alteration in original)). In a sense, the Court has established that "lies" made in the context of satire and imaginative expression are not really lies at all and perhaps not really even statements of "fact," because no reasonable listener could actually believe them to be stating actual facts.

In sum, the Supreme Court's jurisprudence on false statements of fact involves a general rule with certain exceptions and exceptions-to-exceptions. In general, "there is no constitutional value in false statements of fact," and so "the erroneous statement of fact is not worthy of constitutional protection." *Gertz*, 418 U.S. at 340. However, this general principle is subject to certain limited exceptions where First Amendment protection is necessary "to protect speech that matters," *id.* at 341, and to ensure that the "freedoms of expression . . . have the 'breathing space' that they 'need to survive,'" *New York Times*, 376 U.S. at 271-72 (alteration omitted). Accordingly, a defamatory false statement of fact made about a public figure is constitutionally protected if it is made without "knowledge that it was false or with reckless

disregard of whether it was false or not." *Id.* at 280. On the other hand, "the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection." *Garrison*, 379 U.S. at 75. The only qualifier to this rule is that statements that are technically "knowingly false" receive constitutional protection when they "c[an]not reasonably have been interpreted as stating actual facts." *Hustler*, 485 U.S. at 50.

B

Notwithstanding the Court's pronouncements on the unprotected status of false statements of fact, the majority "find[s] no authority holding that false factual speech, as a general category unto itself, is among [the historically unprotected classes of speech]," Maj. Op. at 11861, and concludes that "we presumptively protect . . . false statements," *id.* at 11881. The majority believes that, when the Supreme Court has said that "false statements of fact" are unprotected by the First Amendment, what the Court actually meant was that *defamation* is unprotected by the First Amendment. *See id.* at 11864 ("[W]e believe the historical category of unprotected speech identified in *Gertz* and related law is defamation, not all factual speech."). From this premise, and after refusing to "extend" the unprotected category of speech (defamation) to false statements generally, *id.* at 11865, the majority suggests that false statements of fact are generally entitled to *full* constitutional protection, even if they are *knowingly* false, unless they are defamatory, fraudulent, or integral to criminal conduct, *see id.* at 11870-73.

The majority has effectively overruled *Gertz* and inverted the whole scheme. The Supreme Court has told us consistently that the general rule is that false statements of fact are unprotected, and has carved out certain limited exceptions to this principle in certain contexts. The majority flips this framework around and suggests that false statements of fact are generally unprotected *only* in contexts like defamation and

fraud, and that outside these contexts they are fully protected. *See id.* at 11873 ("[T]he historical and traditional categories of unprotected false factual speech have thus far included only certain *subsets* of false factual statements . . . ."); *id.* at 11875 (finding that only "certain subsets of false factual speech have been declared unprotected," and that "[t]he Act does not fit neatly into any of those . . . classes"). In other words, the majority limits the general rule to its exceptions. In my view, the majority is wrong for a number of reasons.

1

As a general matter, the majority's principle rests on a line of reasoning that I cannot endorse: that our jurisprudence should rest on what we think the Supreme Court "means" rather than what it actually says, and thus, because the Supreme Court means "defamation" when it says "false statements of fact," only the former represents an unprotected category of speech. The majority even considers it "erroneous[ ]" for me to "rel[y] on *Gertz* for its statement that false factual speech is valueless and unprotected." *Id.* at 11864.

With all due respect, I believe that reliance on *Gertz*'s statement (and the Court's numerous other statements to the same effect) is not only far from "erroneous[ ]" but *obligatory*. We do not have the authority as a lower court to limit the Court's statements to what we believe they mean rather than what they actually say. *Gertz* could have used the terms "defamation" or "libel" rather than "false statements of fact" to describe the unprotected category of speech—it presumably knew what these terms mean—but it did not. Because the Court has told us unambiguously that "false statements of fact" are generally unprotected by the First Amendment, this principle should be the starting point for our analysis, not the point for the majority's departure from the principle.[3]

---

[3]The majority's reliance on Justice Stevens's opinion in *Nike, Inc. v. Kasky*, 539 U.S. 654 (2003), *see* Maj. Op. at 11855, gives away its true

2

Even if we had the authority to limit the Supreme Court's statements to what we think they mean rather than what they actually say, the Supreme Court *did* (and does) mean that "false statements of fact" are *generally* unprotected and that (non-satirical and non-theatrical) knowingly false statements of fact are *always* unprotected. Supreme Court precedent, Ninth Circuit precedent, and logic compel this conclusion.

The Supreme Court has used the same framework for analyzing false statements of fact in cases involving *neither* defamation *nor* fraud as it did in *New York Times*, *Garrison*, and *Gertz*; these cases demonstrate that the Court's statements regarding the general unprotected nature of "false statements of fact" and its even more conclusive statements regarding *knowingly* false statements of fact apply to cases outside the defamation/fraud context. In these cases involving neither defamation nor fraud, the Court began with the premise that false statements of fact are unprotected, and its entire analysis was directed toward deciding whether the application of *New York Times*'s "actual malice" standard was necessary in that case to protect speech that matters. Although the Court at times decided that the non-defamation case before it *was* such a case where *New York Times*'s "actual standard" was necessary, it was careful to emphasize, consistent with *Garrison*, that false statements made *with* actual malice fall outside of First Amendment protection. In other words, the only reason that there was even a need for discussion was because the statement in question was arguably made *without* "actual malice"; if the statement in question had been clearly uttered with

intentions. In that case, Justice Stevens concurred in the Court's *dismissal of the grant of certiorari* and, in a parenthetical, suggested that *Gertz*'s statement that there is no constitutional value in false statements of fact was "(perhaps overbroad[ ])." *Id.* at 664. Justice Stevens stopped far short of suggesting that *Gertz* should be overruled, but that is the implication the majority takes away.

actual malice, the statement would be unprotected irrespective of whether *New York Times* applied.

In *Time, Inc. v. Hill*, 385 U.S. 374 (1967), for example, the Court held that an award of damages under New York's "right of privacy" law based on "allegations that [defendant] falsely reported that a new play portrayed an experience suffered by [plaintiff]," *id.* at 376-77, could not be sustained without "proof that the defendant published the report with knowledge of its falsity or in reckless disregard of the truth," *id.* at 388. After careful analysis, rather than "through blind application of *New York Times*," *id.* at 390, the Court concluded that "sanctions against either innocent or negligent misstatement would present a grave hazard of discouraging the press from exercising constitutional guarantees," *id.* at 389. At the same time, the Court was careful to stress, relying on *Garrison*, that " '[t]he use of *calculated* falsehood . . . would put a different cast on the constitutional question.' " *Id.* at 390 (emphasis added) (quoting *Garrison*, 379 U.S. at 75). The Court declared that "the constitutional guarantees can tolerate sanctions against calculated falsehood without significant impairment of their essential function." *Id.* at 389; *see also id.* at 390 ("What we said in *Garrison* . . . is *equally applicable* [here]." (emphasis added)).

And in *Pickering v. Board of Education*, 391 U.S. 563 (1968), the Court applied the *New York Times* framework to a case involving a teacher who claimed that his First Amendment rights were violated when he was terminated for sending to a local newspaper a letter containing false statements of fact critical of the district superintendent. *See id.* at 572-74. As in *Time*, the Court in *Pickering* started from the premise that false statements of fact are unprotected, and the only question was whether the context it was dealing with was similar enough to defamation to merit the application of *New York Times*'s "actual malice" rule. *See id.* at 574. The Court concluded that the potential for self-censorship was sufficient to warrant *New York Times*'s "actual malice" requirement, but

made clear that the extent of constitutional protection was limited: "[I]n a case such as this, *absent* proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id.* (emphasis added) (footnote omitted).[4]

Nothing in the Court's recent decision in *Stevens* is to the contrary. The majority believes that, "[s]ince the *Stevens* Court saw fit to name defamation specifically, rather than false statements of fact generally, as the historical category excluded from constitutional protection, . . . the historical category of unprotected speech identified in *Gertz* and related law is defamation, not all factual speech." Maj. Op. at 11890. But *Stevens*'s use of the word "defamation" is nothing new. As far back as *Chaplinsky*, the Court has frequently used the words "defamation" and "libel" to describe one of the categories of unprotected speech. *See* 315 U.S. at 572 (including among the unprotected "classes of speech" "the lewd and obscene, the profane, the *libelous*, and the insulting or 'fighting' words" (emphasis added)). Then, in *Gertz*, the Court used the broader term "false statements of fact" to describe this category. 418 U.S. at 340; *see also BE & K*, 536 U.S. at 531; *Hustler*, 485 U.S. at 52. Because most of the Court's opinions in this historically unprotected category have dealt with defamation, and because the Court has used both the terms "defamation" and "false statements of fact" to describe speech within the unprotected category, there is nothing interesting about *Stevens*'s use of the term "defamation." If *Stevens* truly

---

[4]Although *BE & K* and *Bill Johnson's* did not involve the freedom of speech *per se* but rather the First Amendment right to petition, these decisions are further examples of the Court's reliance on *Gertz*'s principle outside of the defamation context. *See BE & K*, 536 U.S. at 531 ("[F]alse statements [are] unprotected for their own sake . . . ." (citing *Gertz*, 418 U.S. at 341)); *Bill Johnson's*, 461 U.S. at 743 ("Just as false statements are not immunized by the First Amendment right to freedom of speech, baseless litigation is not immunized by the First Amendment right to petition." (citations omitted) (citing *Gertz*, 418 U.S. at 340)).

stands for the proposition that only defamatory statements—and not false statements of fact generally—constitute the unprotected category, then *Stevens* overruled *sub silentio* every Supreme Court case using the general term "false statements of fact" *and* every case applying the *New York Times-Gertz-Garrison* framework outside of the defamation context. I find this hard to believe.

Similar considerations demonstrate why the majority is misguided in relying upon *Stevens*'s statement that " '[o]ur decisions [following *Chaplinsky*] cannot be taken as establishing a freewheeling authority to declare new categories of speech outside the scope of the First Amendment.' " Maj. Op. at 11866 (second alteration in original) (quoting *Stevens*, 130 S. Ct. at 1586); *see also id.* at 11864-65 ("Unlike our dissenting colleague, we are not eager to extend a statement (often quoted, but often qualified) made in the complicated area of defamation jurisprudence into a new context . . . ."). *Stevens* involved the potential creation of a truly "new" category of unprotected speech: "depictions of animal cruelty." 130 S. Ct. at 1584. This case, in contrast, involves a *preexisting* category of unprotected speech: false statements of fact. Thus, no "expansion" of First Amendment jurisprudence is necessary to hold that Alvarez's false statements are not protected.

Our own cases are in accord with the principle that false statements of fact (not just defamatory or fraudulent false statements) are generally unprotected by the First Amendment, although we have recognized that "constitutional protection is afforded *some* false statements." *Johnson v. Multnomah County*, 48 F.3d 420 (9th Cir. 1995) (emphasis added). We have often applied the *New York Times-Garrison-Gertz* framework outside of the defamation and fraud context.

In *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240 (9th Cir. 1982), for example, we held that "[t]here is no first amendment protection for furnishing with predatory intent false information to an administra-

tive or adjudicatory body," and thus the First Amendment did not shield the defendants from *antitrust* liability. *Id.* at 1261; *see also id.* ("The first amendment has not been interpreted to preclude liability for false statements. . . . '[T]here is no constitutional value in false statements of fact.' " (quoting *Gertz*, 418 U.S. at 340)). We "recogniz[ed] that under certain circumstances allowing the imposition of liability for statements can hamper debate, *see New York Times*," which "*may* suggest that a court should adopt a stricter standard of proof," but we determined that defendants' statements were unprotected regardless of the correct standard of proof because "defendants *knew* the falsity of their statements." *Id.* at 1262 (emphases added). In other words, the defendants' knowledge of the falsity of their statements placed the defendants' statements clearly outside of the First Amendment. Thus, unlike in *Time* and *Pickering*, there was no need for any further discussion of whether the *New York Times* "actual malice" requirement applied. *See id.*

More recently, in *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001), we applied the *New York Times* framework to a case in which the plaintiff claimed that his common law right of publicity had been violated by the defendant's publication of an altered photograph of the plaintiff's name and likeness, *see id.* at 1183, which "create[d] a false impression in the minds of the public that they were seeing [the plaintiff's] body," *id.* at 1186 (quotation marks omitted). Regarding the defendant's First Amendment defense, we determined that the question was whether the district court correctly held that the First Amendment did not protect the defendant's publication because the defendant "published that image *knowing* it was false and intending that the readers believe the falsehood." *Id.* (emphasis added). Although we eventually concluded that the district court erred in finding that "actual malice" existed, *id.* at 1189, the important point is that a finding of knowledge as to falsity would have meant that the defendant's publication was not protected by the First

Amendment, irrespective of the fact that the purported false-hood was not defamatory or fraudulent.[5]

Under the majority's view, the Supreme Court's decisions in *Time* and *Pickering*, and our decisions in *Clipper Exxpress* and *Hoffman*, are all disapproved, if not overruled. But even putting aside these precedents, I do not believe that the majority's principle is logical. Given that the Court has clearly recognized defamation as one of the exceptional situations where protecting certain false statements is necessary to "protect speech that matters," *Gertz*, 418 U.S. at 340, I cannot see how *Gertz* could have meant "defamation" when it said that "false statements of fact" are unprotected. If that were true, there would be nothing left of *Gertz*'s statement that false statements of fact fall outside of First Amendment protection. In other words, the majority interprets *Gertz* the following way: defamation is unprotected by the First Amendment, but it is necessary to protect defamation in order to protect speech that matters. Under the majority's logic, *Gertz* is internally inconsistent, and the exception has swallowed up the rule.

3

Although I believe that it is clear that the Supreme Court's statements regarding false statements of fact extend outside of the defamation and fraud context, I nevertheless find it necessary to respond to the majority's misguided "bona fide harm" theory. The majority asserts that the Supreme Court has extended the *New York Times-Garrison-Gertz* framework only to false statements "likely to cause a bona fide harm," such as those that constitute fraud. Maj. Op. at 11870. In other

---

[5]The majority is "not persuaded that *Hoffman* . . . is anything more than a variation on defamation jurisprudence." Maj. Op. at 11865 n.10. But although the false statements in *Hoffman* were arguably more like defamation than the false statements in Alvarez's case, *Hoffman* and similar cases nevertheless demonstrate that "false statements of fact" means "*false statements of fact*," not simply "defamation," and that the former represents the historically unprotected category of speech, not the latter.

words, the majority suggests that a false statement loses First Amendment protection only if it is likely to cause a cognizable—indeed, "irreparable"—harm. *Id.* at 11863. Based on this premise, the majority might assert that the Court applied the *New York Times-Garrison-Gertz* framework in *Time*, *Pickering*, *Clipper Exxpress*, and *Hoffman* because the false statements in those cases were likely to cause a cognizable harm, but the false statements punished by the Stolen Valor Act are fully protected because these statements do not generally produce what the majority considers to be a "bona fide harm." *See id.* at 11871 n.12. I respectfully disagree.

a

The likelihood of a "bona fide harm" has nothing to do with whether a category of speech loses First Amendment protection. *Stevens* rejected the notion that the First Amendment protection afforded a class of speech depends on a consideration of the "societal costs" of the class of speech. 130 S. Ct. at 1585. Rather, whether a category of speech is constitutionally protected is a *historical* question that depends on whether a class of speech has traditionally been thought to be of low First Amendment *value*. As the Supreme Court reiterated in *Stevens*:

> From 1791 to the present, . . . the First Amendment has permitted restrictions upon the content of speech in a few limited areas, and has never include[d] a freedom to disregard these *traditional* limitations. These *historic* and *traditional* categories long familiar to the bar . . . are well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem.

*Id.* at 1584 (emphases added) (quotation marks and citations omitted) (alteration in original); *see also id.* at 1586 (noting that the Court's First Amendment cases regarding speech out-

side First Amendment protection have "grounded [their] analysis in a *previously recognized, long-established* category of unprotected speech" (emphasis added)); *Chaplinsky*, 315 U.S. at 572 (describing unprotected classes of speech as "utterances [that] are *no essential part of any exposition ideas*, and are of such *slight social value* as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality" (emphases added)). Once again, decades of Supreme Court case law make clear that false statements of fact are one of those classes of speech that are generally considered to be of low First Amendment value and therefore have traditionally fallen outside First Amendment protection.

I agree with the majority that the Court's statements in this regard cannot be interpreted as "absolute proposition[s]," Maj. Op. at 11855, because the Court has established that, although "false statements may be unprotected for their own sake," *BE & K*, 536 U.S. at 531, the Constitution "requires that we protect *some* falsehood in order to protect speech that matters," *Gertz*, 418 U.S. at 341 (emphasis added). But the protection the Court has afforded for "*some* falsehood" has been limited to narrow subsets within the historically unprotected category—*certain* false statements of fact critical of public figures if made without "knowledge that [they are] false or with reckless disregard of whether [they are] false or not," *New York Times*, 376 U.S. at 280; *certain* false statements of fact in contexts similar to defamation, such as intrusions on a public figure's privacy, *see Time*, 385 U.S. at 376-77, 388, and criticisms of one's superior, *see Pickering*, 391 U.S. at 572-74; and *certain* false statements of fact that "c[annot] reasonably have been interpreted as stating actual facts," *Hustler*, 485 U.S. at 50. The fact that the Supreme Court has extended limited constitutional protection to some false statements of fact in defamation and defamation-like cases and that these cases generally involve a cognizable harm to a particular party does not demonstrate that a cognizable harm is a *prerequisite* before a false statement of fact loses its First

Amendment protection. Rather, the spheres of protection carved out in *New York Times*, *Hustler*, and like cases represent limited *exceptions* to the general rule that false statements of fact are *not protected* by the First Amendment, irrespective of a cognizable harm to a specific person. *See Keeton*, 465 U.S. at 776 (false statements of fact have "no constitutional value" because they "harm *both* the subject of the falsehood *and* the readers of the statement" (first emphasis added) (quotation marks omitted)). If a false statement of fact does not fall within one of these exceptions, it falls within the general historically unprotected category of speech, and the absence of "harm" is irrelevant.

b

The Court's obscenity jurisprudence is an embarrassment to the majority's newly-minted "harm" requirement. The Court has long held that obscene speech is not protected by the First Amendment, *see Chaplinsky*, 315 U.S. at 572, because it is "utterly without redeeming social importance," *Roth v. United States*, 354 U.S. 476, 484 (1957), and not because the states have satisfied some "proof of harm" requirement. In *Miller v. California*, 413 U.S. 15 (1973), the Supreme Court defined works that are "obscene" and therefore fall outside the protection of the First Amendment, and "bona fide harm" is notably absent as a requirement under its definition. The Court stated:

> [W]e now confine the permissible scope of [obscenity] regulation to works which depict or describe sexual conduct. That conduct must be specifically defined by the applicable state law, as written or authoritatively construed. A state offense must also be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value.

*Miller*, 413 U.S. at 24 (footnote omitted).

We might say, of course, that obscenity is *generally* harmful, or that obscenity has traditionally been *thought* to be harmful given that obscenity regulations represent a legislative determination that obscene materials generally degrade our morals or endanger public safety. But the majority holds the Stolen Valor Act unconstitutional because it does not require *proof* that any particular statement causes harm. While acknowledging Congress's finding that false claims like Alvarez's "damage the reputation and meaning of [military] decorations and medals," Stolen Valor Act of 2005, Pub. L. No. 109-437, § 2(1), 120 Stat. 3266 (2005) (the "Findings"); Maj. Op. at 11867, the majority emphasizes that the Findings "do not actually limit the *application* of the Act" because "[t]here is no requirement in the Act that the government bear the burden to *prove* that the defendant's speech or writing proximately caused damage to the reputation and meaning of military decorations and medals," Maj. Op. at 11867 (second emphasis added).[6]

The problem is that this is true of obscenity regulations as well; although obscenity laws are generally targeted at some cognizable harm, they do not explicitly require that the government even *identify*, much less *prove*, a cognizable harm in every case. Indeed, it was of no concern to the Court that "there [wa]s no conclusive proof of a connection between antisocial behavior and obscene material," because "[n]othing in the Constitution prohibits a State from reaching such a conclusion and acting on it legislatively simply because there [wa]s no conclusive evidence or empirical data." *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 60-61, 63 (1973). Thus, the Court's obscenity jurisprudence demonstrates that a "harm" requirement simply does not exist in terms of the protection afforded a category of speech.

---

[6]I return to this point in Part II.C.

c

The majority places great weight on the Court's decision in *Schenck v. United States*, 249 U.S. 47 (1919), in which the Court famously held that "[t]he question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent." *Id.* at 52. The majority even suggests that the "clear and present danger" rule is the test "for defining the relevant subset of false speech that is historically unprotected." Maj. Op. at 11875-76; *see also id.* at 11877 ("Following *Schenck*, . . . we might articulate the class of false factual speech unprotected by the First Amendment to be that false factual speech which creates a clear and present danger of a harm Congress has a right to prevent.").

The majority is wrong. The Court has never used the "clear and present danger" test to determine whether a category of speech is protected in the first instance. Much to the contrary, the Court has specifically held that the existence of a "clear and present danger" of harm is irrelevant in the context of unprotected categories of speech. In *Beauharnais v. Illinois*, 343 U.S. 250 (1952), the Court stated:

> Libelous utterances not being within the area of constitutionally protected speech, it is unnecessary, either for us or for the State courts, to consider the issues behind the phrase "clear and present danger." Certainly no one would contend that obscene speech, for example, may be punished only upon a showing of such circumstances. Libel, as we have seen, is in the same class.

*Id.* at 266.

*Schenck* dealt with a content-based restriction of a category of speech that would now be considered *clearly* entitled to

First Amendment protection—indeed, there are few categories of speech *more* valuable in terms of First Amendment principles than opinions critical of the government on matters of national security, such as military conscription. *See Schenck*, 249 U.S. at 51; *see also Brandenburg v. Ohio*, 395 U.S. 444, 448-49 (1969); Elena Kagan, *The Changing Faces of First Amendment Neutrality:* R.A.V. v. St. Paul*, Rust v. Sullivan*, and the Problem of Content-Based Underinclusion*, 1992 Sup. Ct. Rev. 29, 39 (1992) (providing "seditious advocacy" as an example of "constitutionally *protected* speech" (emphasis added)). *Schenck* and cases like it did not consider whether a category of speech is *protected* by the First Amendment—again, that question depends on whether the speech has historically been considered of low First Amendment value. Rather, the question in those cases was whether the government's interest in preventing lawless action—that is, in preventing the harm potentially produced by *protected* speech—was sufficient to *overcome* the First Amendment interests in a particular context, *see* Kagan, 1992 Sup. Ct. Rev. at 39 ("In deciding [a case involving seditious advocacy,] . . . the Court will ask . . . whether the government has a sufficient reason to restrict the speech actually affected."), which depended on whether the speech at issue "create[d] a clear and present danger," *Schenck*, 249 U.S. at 52.

d

Finally, the majority's reliance on statutes criminalizing fraud and similar crimes, *see* Maj. Op. at 11870-73, is both flawed and puzzling. Although fraud statutes generally require that the fraudulent statement cause an injury, and although the Supreme Court has held that fraudulent statements are not entitled to First Amendment protection, *see, e.g.*, *Ill. ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003), it stretches logic to conclude from these holdings that a cognizable injury is *necessary* for a category of speech to fall outside First Amendment protection. That is, just because fraud statutes may require some proof of harm,

and such statutes have been held constitutional, does not mean that in order for a statute such as the Stolen Valor Act to be constitutional, it too must require proof of harm.[7] To so hold is a formal error in logic. The notion that a regulation of unprotected speech requires individualized proof of a cognizable harm is inconsistent with the Supreme Court's First Amendment jurisprudence.

\* \* \* \* \*

In sum, the better interpretation of the Supreme Court's cases and those of our court is that false statements of fact—as a general category—fall outside of First Amendment protection except in certain contexts where such protection is necessary "to protect speech that matters." If a false statement does not fall within one of these exceptions, the general rule applies. And even in the exceptional contexts, a false statement that is neither satirical nor theatrical is unprotected if it is made with knowledge or reckless disregard of falsity.

## II

With these principles in mind, I now turn to Alvarez's as-applied challenge.

---

[7]Numerous statutes are called into question by the majority's opinion. The following are just some of the statutes that punish false statements and do not appear to require proof of harm (including that the false statement be "material"): 18 U.S.C. § 1011 (punishing "any false statement . . . relating to the sale of any mortgage, to any Federal land bank"); 18 U.S.C. § 1015(a) (punishing "any false statement under oath, in any case, proceeding, or matter relating to . . . naturalization, citizenship, or registry of aliens"); 18 U.S.C. § 1026 (punishing "any false statement for the purpose of influencing in any way the action of the Secretary of Agriculture . . . in connection with . . . farm indebtedness"); 18 U.S.C. § 1027 (punishing "any false statement" made "in any document required by [ERISA]").

A

In a public meeting, Alvarez stated: "I'm a retired marine of 25 years. I retired in the year 2001. Back in 1987, I was awarded the Congressional Medal of Honor. I got wounded many times by the same guy. I'm still around." Alvarez does not deny that his statement that he received the Congressional Medal of Honor was a statement of fact, that this statement was false, and that he made the statement with full knowledge of the statement's falsity. He does not attempt to defend his actions as hyperbole or imaginative expression, nor does he claim that he was misunderstood in context. Alvarez also knew when he uttered the statement that his claim to have been a Marine was false, that he had not served in any branch of the armed forces for twenty-five years, and that no one had shot and wounded him while he was in the service of his country.

All things considered, Alvarez's self-introduction was neither a slip of the tongue nor a theatrical performance; it was simply a lie. Under the rules announced in *Garrison* and its progeny, Alvarez's knowingly false statement is *excluded*[8] from the limited spheres of protection carved out by the Supreme Court for false statements of fact necessary to protect speech that matters, and it is therefore not entitled to constitutional protection. *See Garrison*, 379 U.S. at 75 ("[T]he

---

[8]I emphasize the fact that the Supreme Court has *affirmatively excluded* knowingly false statements from First Amendment protection rather than simply *failed to include* them. The majority argues that, "even if one agrees with the dissent that *Gertz* and its progeny require[ ] the historical category of unprotected speech at issue here [to] be defined as knowingly false factual speech per se, that is simply not enough to make the [Stolen Valor] Act immune from First Amendment analysis," and that we would need to "guess what rule the Court would adopt for [knowingly false statements]." Maj. Op. at 11865 n.9. The majority seems to suggest that the Supreme Court has not yet decided what degree of constitutional protection will be afforded knowingly false statements of fact. For the reasons I have explained above, I think the matter is quite to the contrary.

knowingly false statement . . . do[es] not enjoy constitutional protection."); *Gertz*, 418 U.S. at 340 ("[T]he intentional lie . . . [does not] materially advance[ ] society's interest in 'uninhibited, robust, and wide-open' debate on public issues." (quoting *New York Times*, 376 U.S. at 270)); *Time*, 385 U.S. at 389 ("[T]he constitutional guarantees can tolerate sanctions against calculated falsehood without significant impairment of their essential function.").[9] Thus, there is no need to apply strict scrutiny.[10]

## B

The Supreme Court's clear rules are sufficient to doom Alvarez's as-applied challenge,[11] but even apart from these

---

[9]The majority is "concern[ed] . . . because of [the Act's] potential for setting a precedent whereby the government may proscribe speech solely because it is a lie." Maj. Op. at 11850. The majority fears that, under my interpretation, the government could "criminaliz[e] lying about one's height, weight, age, or financial status on match.com or facebook, or falsely representing to one's mother that one does not smoke, drink alcoholic beverages, is a virgin, or has not exceeded the speed limit while driving on the freeway." Maj. Op. at 11851. Alvarez provides a similar parade of horribles, arguing that Congress could prohibit lying to one's children about the existence of Santa Claus.

But the fact that we might find the majority's and Alvarez's hypothetical laws troubling from a policy perspective is irrelevant to the First Amendment question. *Garrison*, *Gertz*, and *Time* could not have been clearer: knowing lies are unprotected by the First Amendment. Until the Supreme Court tells us otherwise, the proper target for the majority's concerns is the legislature, not this court.

[10]I agree with the majority that *if* the Stolen Valor Act were subjected to strict scrutiny, the Act would not satisfy this test. *See* Maj. Op. at 11877-80. I simply do not agree that the Act *should* be subjected to strict scrutiny.

[11]The majority points out that, if I am correct, "the opinion in this case would need be no more than a few paragraphs in length," and asserts that "the First Amendment requires more." Maj. Op. at 11864 n.9. The majority is correct that, in the Supreme Court's cases involving false statements of fact, "the First Amendment analysis [wa]s . . . rigorous," *id.*, in spite

rules, none of the concerns that animated *New York Times* and its progeny should shield Alvarez's statement. *New York Times* imposed an "actual malice" requirement on defamation suits brought by public figures trying to suppress *criticism of them as public figures*. *See* 376 U.S. at 282 ("We hold today that the Constitution delimits a State's power to award damages for libel in actions brought by public officials against *critics of their official conduct*." (emphasis added)); *Gertz*, 418 U.S. at 334 (discussing "a constitutional privilege intended to free *criticism of public officials* from the restraints imposed by the common law of defamation" (emphasis added)). In particular, the *New York Times* Court found that the "actual malice" standard was necessary to prevent defamation from being used by public officials as a civil substitute for criminal sedition: "What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel" because "damage awards . . . may be markedly more inhibiting than the fear of prosecution." 376 U.S. at 277 (footnote omitted). The Court was determined not to let public officials suppress or chill criticism of their official actions by threat of a lawsuit. And the Court was confident that public officials, because of their public position, would "have a . . . realistic opportunity to counteract false statements" due to their "significant[ ] . . . access to the channels of effective communication." *Gertz*, 418 U.S. at 344.

The principles in *New York Times* do not extend to false self-promotion. Nor do these principles extend to false self-

---

of the general unprotected nature of false statements of fact. But as discussed above, this "rigor" was necessary only to determine whether the Court was faced with one of the unique situations where New York Times's "actual malice" standard was *necessary* in order to protect speech that matters. *See, e.g.*, *Pickering*, 391 U.S. at 574; *Time*, 385 U.S. at 389-90; *New York Times*, 376 U.S. at 271-72. Here, there is no need to consider whether *New York Times*'s standard applies because Alvarez indisputably *did* act with "actual malice."

promotion by public officials—that is, to officials who portray themselves in a false but positive light. Public discourse requires that citizens are equally free to praise or to condemn their government and its officials, but I can see no value in false, self-aggrandizing statements by public servants. Indeed, the harm from public officials outright lying to the public on matters of public record should be obvious. If the Stolen Valor Act "chills" false autobiographical claims by public officials such as Alvarez, our public discourse will not be the worse for the loss.

C

The majority provides two main reasons for why the Act is unconstitutional as applied to Alvarez. First, the majority reasons that the Act is unconstitutional because it "does not require a malicious violation, nor does it contain any other requirement or element of scienter . . . . Without a scienter requirement to limit the Act's application, the statute raises serious constitutional concerns . . . because the First Amendment clearly prohibits criminally punishing negligent speech about matters of public concern." Maj. Op. at 11866 (citing *Gertz*, 418 U.S. at 340, 347).

For one thing, *Gertz* does not stand for this proposition; in *Gertz*, the Supreme Court "*refus[ed]* to extend the *New York Times* privilege to defamation of private individuals," even though the subject matter was a matter of public concern. *Gertz*, 418 U.S. at 350 (emphasis added). But even accepting that false statements of fact made about *oneself* can be punished only if they are made with "actual malice" (a principle that is not clearly true), this requirement is irrelevant to Alvarez's as-applied challenge because there is no dispute that Alvarez *did* make his false statement with "actual malice"—that is, knowingly.[12] If anything, the lack of a malice require-

---

[12]Unlike the government, I do not propose that a scienter requirement be read into the Act.

ment is relevant only to Alvarez's facial challenge, which I will discuss in Part III.[13]

Second, the majority holds that the Act is unconstitutional because it does not require that the false statement proximately cause an "*irreparable*" harm. Maj. Op. at 11863. As discussed above, the First Amendment contains no such requirement, *see* Part I.B.3, *supra*, and thus the Act's failure to require harm is irrelevant to the determination of whether it is unconstitutional.

But even if the First Amendment demanded some proof of harm, the majority has supplied no reason to question Congress's determination that "[f]raudulent claims surrounding the receipt of . . . [military] decorations and medals awarded by the President or the Armed Forces of the United States damage the reputation and meaning of such decorations and medals." Stolen Valor Act of 2005, Pub. L. No. 109-437, § 2(1), 120 Stat. 3266 (2006). When George Washington created the Badge of Military Merit, the predecessor to the Purple Heart, he wished to honor those who performed "singularly meritorious action" with "the figure of a heart in purple cloth." Those who demonstrated "unusual gallantry, . . . extraordinary fidelity, and essential service in any way, [would] meet with a due reward." At the same time, he ordered that, "[s]hould any who are not entitled to the honors, have the insolence to assume the badges of them, they shall be severely punished." GENERAL ORDERS OF GEORGE WASHINGTON ISSUED AT NEWBURGH ON THE HUDSON, 1782-1783, at 34-35 (Edward C. Boynton, ed., 1883) (reprint 1909) (Order of August 7, 1782). Such false representations not only dishonor the decorations and medals themselves, but dilute the select group of those who have earned the nation's grati-

---

[13]Indeed, because the majority does not hold that the Stolen Valor Act is unconstitutionally overbroad, it is unclear what relevance the Act's lack of a scienter requirement has even to the majority's holding with respect to Alvarez's facial challenge.

tude for their valor. Every nation needs to honor heroes, to thank them for their selflessness and to hold them out as an example worthy of emulation. The harm flowing from those who have crowned themselves unworthily is surely self-evident.

The majority finds Congress's purpose inadequate because the Act is not expressly *limited* to statements that cause harm, *see* Maj. Op. at 11867 ("[W]hile the 'Findings' identify the injury the Act targets, they do not actually limit the *application* of the Act."), and because "[t]here is no requirement in the Act that the government bear the burden to *prove* that the *defendant's* speech or writing proximately caused damage to the reputation and meaning of military decorations and medals," *id*. (emphases added). Because the majority finds "no readily apparent reason for assuming, without specific proof, that the reputation and meaning of military decorations is harmed *every time* someone lies about having received one," the majority holds the Act unconstitutional. *Id.* (emphasis added).

But the government does not have to prove, on a case-by-case basis, that the statement of a *single defendant* damaged the reputation of a military award. The obscenity cases are again instructive. In *Paris Adult Theatre I*, the Court rejected the cry for "scientific data . . . demonstrat[ing] that exposure to obscene material adversely affects men and women or their society." 413 U.S. at 60. Instead, the Court said that legislatures could rely on "various unprovable assumptions," the same kinds of "assumptions [that] underlie much lawful state regulation of commercial and business affairs," such as federal securities laws, antitrust laws, environmental laws, and a "host" of others. *Id.* at 61-62. Even in areas touched by the First Amendment, "[t]he fact that a congressional directive reflects unprovable assumptions about what is good for the people, including imponderable aesthetic assumptions, is not a sufficient reason to find that statute unconstitutional." *Id.* at 62. Given the impossibility of proving the kind of "reputa-

tional harm" demanded by the majority, it is no wonder that neither Congress nor the Constitution requires it.

What would Alvarez have had to say to satisfy the majority's newfound harm standard? The majority itself concedes that Alvarez's statement was a "deliberate and despicable [lie]," Maj. Op. at 11879, that it was a "worthless, ridiculous, and offensive untruth[ ]," and that Alvarez "was proven to be nothing more than a liar,"*id.* at 11881. He was indeed "more" than that. The hubris of Alvarez's claim to have received the Congressional Medal of Honor in 1987 may not be apparent to ordinary Americans, and it may not have been obvious at the joint meeting of the water districts, but it would not have been lost on the men and women who are serving or have served in our armed forces. By his statement, Alvarez claimed status in a most select group: American servicemen who lived to receive the Congressional Medal of Honor. No living soldier has received the Congressional Medal of Honor since the Vietnam War. Greg Jaffe and Craig Whitlock, *Pentagon Recommends Medal of Honor for a Living Soldier*, THE WASHINGTON POST, July 1, 2010, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2010/06/30/AR2010063005346.html (last visited July 6, 2010). Indeed, no Congressional Medal of Honor was awarded to any soldier participating in the Gulf War, and for our conflicts over the past decade, only two were awarded for actions in Somalia, four for actions in Iraq, and two for actions in Afghanistan—all posthumously. *Id.* Alvarez's statements dishonor every Congressional Medal of Honor winner, every service member who has been decorated in any away, and every American now serving. Such "insolence . . . [may] be . . . punished."**[14]**

---

**[14]**The government might well be able to supply further evidence of the harm caused by false claims of military awards. The government did not brief this matter because Alvarez never argued that false statements of fact fall outside of First Amendment protection only if they produce a cognizable harm. Given the novelty of the majority's holding, it is not surprising that the government did not anticipate it.

* * * * *

Alvarez's knowing lie is not entitled to constitutional protection. Thus, there is no need to subject the Stolen Valor Act to strict scrutiny. I would hold that the Stolen Valor Act is constitutional as applied to him. I turn now to Alvarez's facial challenge.

## III

The majority holds that the Act is "facially invalid under the First Amendment." Maj. Op. at 11881. Some of the majority's analysis sounds in the overbreadth doctrine, but because the majority does not actually apply this doctrine, its facial holding is presumably based on the reasoning "that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 746 (1987). This is not surprising given that the majority believes that the Act is unconstitutional as applied to Alvarez, who is perhaps the prototypical candidate for a constitutional application of the Act. Because I believe that the Act is constitutional as applied to Alvarez, my conclusion regarding the facial constitutionality of the Act necessarily rests on a discussion of Alvarez's overbreadth challenge. I would hold that because any overbreadth of the Act can be eliminated by construction and is, in any event, far from "substantial," *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973), the Act is facially constitutional.

The overbreadth doctrine is, literally, an extraordinary doctrine, because it represents an exception to the usual rules of Article III standing. Ordinarily, "a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick*, 413 U.S. at 610. However, the Supreme Court has carved out an exception to this standing doctrine in the First Amendment area because "the First Amendment needs breathing space" and an overly broad statute can result

in intolerable self-censorship. *Id.* at 611. Thus, the Court has "permitted [litigants] to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.* at 612. "If such an overbreadth challenge succeeds, the prosecution fails regardless of the nature of the defendant's own conduct," *Wurtz v. Risley*, 719 F.2d 1438, 1440 (9th Cir. 1983), because a successful overbreadth challenge renders a statute unconstitutional and, therefore, "invalid in *all* its applications," *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 483 (1989). Thus, the doctrine is employed "sparingly and only as a last resort." *Broadrick*, 413 U.S. at 613.

In *Broadrick*, the Court announced what has become the fundamental rule in the First Amendment overbreadth analysis: in order for a statute to be held unconstitutionally overbroad, "the overbreadth of [the] statute must not only be real, but *substantial* as well, judged in relation to the statute's plainly legitimate sweep." *Id.* at 615 (emphasis added).[15] "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge. . . . [T]here must be a realistic danger that the statute itself will *significantly* compromise recognized First Amendment protections . . . for it to be

---

[15]*Broadrick* dealt with a regulation of activities that had a First Amendment component but that were not "pure speech." 413 U.S. at 615. In *New York v. Ferber*, 458 U.S. 747 (1982), the Court extended *Broadrick*'s requirement of substantial overbreadth to cases involving "pure speech." *See id.* at 772 (reasoning that *Broadrick*'s rationale "appears equally applicable to the publication of books and films as it is to activities, such as picketing or participation in election campaigns, which have previously been categorized as involving conduct plus speech"); *see also Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503 n.12 (1985) ("The Court of Appeals erred in holding that the *Broadrick* . . . substantial overbreadth requirement is inapplicable where pure speech rather than conduct is at issue. [*Ferber*] specifically held to the contrary.").

facially challenged on overbreadth grounds." *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800-01 (1984) (emphasis added). The Court elaborated on the meaning of "substantial" overbreadth in *New York State Club Association v. City of New York*, 487 U.S. 1 (1988), and held that the party challenging the law must demonstrate not just from the text of the statute but also "*from actual fact* that a substantial number of instances exist in which the [l]aw cannot be applied constitutionally." *Id.* at 14 (emphasis added). And in *United States v. Williams*, 553 U.S. 285 (2008), the Court suggested that *Broadrick*'s rule actually involves two requirements, namely that the statute's overbreadth must be substantial (1) "in an absolute sense" and (2) "relative to the statute's plainly legitimate sweep." *Id.* at 292 ("[W]e have vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep.").

In sum, the party asserting the overbreadth challenge has a difficult burden to satisfy: he must demonstrate that the statute is substantially overbroad both in an absolute sense and relative to the legitimate sweep of the statute, *id.*, and must make such a showing based both on the text of the statute and on actual fact, *N.Y. State Club*, 487 U.S. at 14.

Although the majority opinion does not formally apply overbreadth analysis to the Stolen Valor Act, it does provide a number of examples of speech potentially reached by the Act that are not present in Alvarez's particular case. Thus, I will conduct my overbreadth analysis using these examples and those provided by Alvarez. Based on the majority's and Alvarez's examples, the Stolen Valor Act could arguably be held unconstitutionally overbroad for two main reasons: (1) the Act does not contain a scienter requirement and might, therefore, reach inadvertent violations of the Act; and (2) the Act could be applied to satire or imaginative expression. I address each of these potential applications of the Act in turn.

A

The majority proclaims that the Act is unconstitutional because it "does not require a malicious violation, nor does it contain any other requirement or element of scienter . . . . Without a scienter requirement to limit the Act's application, the statute raises serious constitutional concerns . . . because the First Amendment clearly prohibits criminally punishing negligent speech about matters of public concern." Maj. Op. at 11866 (citing *Gertz*, 418 U.S. at 340, 347). It is not clear from the majority's opinion exactly what it means by a "negligent" false claim of military honor, but the only plausible instance of such negligence that I can conceive of is an ambiguous statement that is incorrectly understood to have claimed receipt of a military award, when in fact the person did not actually make any such claim.[16] For example, one could imagine a person saying "I have a Medal of Honor" and someone mistakenly interpreting him to mean that he has been *awarded* the Congressional Medal of Honor, even though the speaker means only that he merely *possesses* it, perhaps as a family heirloom.

However, such mistaken false statements do not present a constitutional problem for the Act. First, the Act is amenable to a reasonable construction that precludes its application to these kinds of statements. Second, even if the Act could be interpreted to reach these kinds of mistaken false statements, and even if such statements were entitled to constitutional protection (which is not clear), this potential sweep of the Act does not even come close to "substantial" overbreadth.

---

[16]Another conceivable "negligent" or "mistaken" claim is one in which the speaker mistakenly *believes* that he has won a military award, but I do not consider it realistic that a person (let alone a substantial number of people) would mistakenly believe that he has been awarded a "decoration or medal authorized by Congress for the Armed Forces of the United States." 18 U.S.C. § 704(b).

1

The first step in the overbreadth analysis is to determine whether the Stolen Valor Act actually covers statements that can be mistakenly interpreted to be false claims of military awards. *See Williams*, 553 U.S. at 293 ("The first step in over-breadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."). Crucially, the Supreme Court has established that "[f]acial overbreadth has not been invoked when a limiting construction has been *or could be* placed on the challenged statute." *Broadrick*, 413 U.S. at 613 (emphasis added); *see also Hooper v. California*, 155 U.S. 648, 657 (1895) ("[E]very reasonable construction must be resorted to in order to save a statute from unconstitutionality."). In other words, even if the Act could *possibly* be interpreted to reach some constitutionally protected speech, the Act will not be held unconstitutionally overbroad if it is *also* " 'readily susceptible' " to a construction that eliminates such overbreadth. *Stevens*, 130 S. Ct. at 1592 (quoting *Reno v. ACLU*, 521 U.S. 844, 884 (1997)).[17]

The Stolen Valor Act punishes a person who "falsely *represents* himself or herself" to have received a military award authorized by Congress. 18 U.S.C. § 704(b) (emphasis added). Webster's first definition of the word "represent" is "[t]o bring clearly before the mind: [to] cause to be known . . . : [to] present esp. by description." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1926 (2002). Under this definition, an ambiguous statement that could conceivably be misinterpreted to claim receipt of a military award could not be punished under the Act because such a statement would not

---

[17]Although a reasonable limiting construction saves a statute from being held facially overbroad, the government's promise of reasonable prosecutorial discretion does not. *See Stevens*, 130 S. Ct. at 1591 ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").

"bring clearly before the mind" of the listener that the speaker has described himself as having won the award, particularly when (as will almost always be the case) the context of the statement makes it obvious that the speaker is not making such a representation.

For example, Congress has made no attempt to preempt the use of the phrase "medal of honor," and any number of universities and high schools award some kind of a "medal of honor." The recipients may truthfully represent themselves as "medal of honor" winners, but no one should fear prosecution under the Stolen Valor Act. Congress was quite careful to define "decoration[s] or medal[s]" as those "authorized by Congress for the Armed Forces of the United States." 18 U.S.C. § 704(b). And in the special case of the Medal of Honor, Congress described it as "a *Congressional* Medal of Honor"—presumably to distinguish it from other medals of honor—and defined it as "a medal of honor awarded under [10 U.S.C. §§ 3741, 6241, or 8741, or 14 U.S.C. § 491]." 18 U.S.C. § 704(c)(2)(A) (emphasis added). No one reading the Act should have any question that he or she may continue to use the term "medal of honor" to denote those medals of honor awarded by our nation's educational institutions. The Stolen Valor Act reaches only those who claim to have received the Congressional Medal of Honor, as defined in the U.S. Code.

In sum, as long as the Act is correctly applied according to a reasonable interpretation of the word "represents," it will not sweep in ambiguous statements that can merely be mistakenly interpreted as a false claim of a congressionally authorized military award. Thus, because a reasonable "limiting construction"— indeed, the *most* reasonable construction —can be placed on the word "represent" that precludes its application to such statements, the Act is not overbroad in this regard. *Broadrick*, 413 U.S. at 613; *see also Hooper*, 155 U.S. at 657.

2

Even if mistaken false statements were theoretically subject to punishment under the Stolen Valor Act, common sense tells us that such punishment will be extraordinarily rare if not nonexistent, both "in an absolute sense" and "relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292. In an absolute sense, Alvarez cannot (and has not even attempted to) demonstrate "from *actual fact*" that there is a "realistic danger" or that "a substantial number of instances exist in which" mistaken statements will be charged under the Act. *N.Y. State Club*, 487 U.S. at 11, 14 (emphasis added); *Taxpayers for Vincent*, 466 U.S. at 801. Both Alvarez and the majority have failed to identify a single instance in which the Act has been applied in a context other than Alvarez's: a simple lie about receiving a military honor.

Any overbreadth of the Act is also far from substantial "relative to the statute's plainly legitimate sweep," *Williams*, 553 U.S. at 292, because, "[i]n the vast majority of its applications, [the Act] raises no constitutional problems whatsoever," *id.* at 303. False claims of military valor have been increasing: "The FBI investigated 200 stolen valor cases last year and typically receives about 50 tips a month, triple the number that came in before the September 2001 terrorist attacks." Christian Davenport, *One Man's Database Helps Uncover Cases of Falsified Valor*, THE WASHINGTON POST, May 10, 2010, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2010/05/09/AR2010050903363.html?hpid =topnews (last visited July 6, 2010); *see also* Keith Rogers, *Prosecuting Fraud Cases: Military Imposters Targeted*, LAS VEGAS REVIEW-JOURNAL, June 25, 2010, *available at* http://www.lvrj.com/news/military-impostors-targeted-9714 1054.html (last visited July 6, 2010) ("The problem of [military imposters] is fast reaching epidemic proportions." (quotation marks omitted)). And again, neither the majority nor Alvarez has pointed to even one case involving a person who was mistakenly interpreted to have claimed a military award.

Thus, this seems to me "the paradigmatic case of a . . . statute whose legitimate reach dwarfs its arguably impermissible applications." *New York v. Ferber*, 458 U.S. 747, 773 (1982); *see also Magill v. Lynch*, 560 F.2d 22, 30 (1st Cir. 1977) ("Some sensitivity to reality is needed; an invalid application that is far-fetched does not deserve as much weight as one that is probable.").

This case falls far short of the level of overbreadth that the Supreme Court has found to be "substantial." In *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), for example, the Court was faced with a federal statute that "extend[ed] the federal prohibition against child pornography to sexually explicit images that appear[ed] to depict minors but were produced without using any real children," thus "proscrib[ing] a significant universe of speech" that fell within neither the unprotected category of obscenity under *Miller* nor the unprotected category of child pornography under *Ferber*. *Id.* at 239-40. The Court held that the statute was "substantially overbroad and in violation of the First Amendment." *Id.* at 258. In so holding, the Court reasoned that "teenage sexual activity and the sexual abuse of children[ ] have inspired *countless* literary works," both ancient and contemporary, which "explore themes within the wide sweep of the statute's prohibitions." *Id.* at 247-48 (emphasis added).

More recently, in *Stevens*, the Court addressed a statute establishing a criminal penalty for anyone who knowingly "create[d], s[old], or possesse[d] a depiction of animal cruelty," where a "depiction of animal cruelty" was defined as one "in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed." 130 S. Ct. at 1582; 18 U.S.C. § 48(a), (c)(1). In holding that the statute was unconstitutionally overbroad, the Court "read § 48 to create a criminal prohibition of *alarming breadth*," emphasizing that the language of the statute would sweep in the "*enormous national market* for hunting-related depictions in which a living animal is intentionally killed," and that "[t]hose seeking to comply with

the law [would] face a bewildering maze of regulations from at least 56 separate jurisdictions." *Stevens*, 130 S. Ct. at 1588-89 (emphases added). "The demand for hunting depictions exceed[ed] the estimated demand" for depictions that Congress could legitimately proscribe. *Id.* at 1589; *see also, e.g.*, *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574-75 (1987) (invalidating an ordinance that, "by prohibiting *all* protected expression [at Los Angeles International Airport], purport[ed] to create a virtual 'First Amendment Free Zone' at [the airport]," potentially covering "virtually every individual who enter[ed] [the airport]").

The statutes that we have held to be facially overbroad have also been significantly broader than the Stolen Valor Act. In *Wurtz*, for example, we addressed the constitutionality of Montana's "intimidation statute," which punished both constitutionally proscribable threats and those protected by the First Amendment. 719 F.2d at 1439, 1441. We held that the statute was unconstitutionally overbroad because it would sweep in "*many* relatively harmless expressions," including such common expressions as "[t]hreats of sit-ins, marches in the street, mass picketing and other such activities." *Id.* at 1442 (emphasis added). We concluded that the statute "applie[d] so broadly to threats of minor infractions, to threats not reasonably likely to induce a belief that they will be carried out, and to threats unrelated to any induced or threatened action, that a *great deal* of protected speech [wa]s brought within the statute." *Id.* (emphasis added).

These cases illustrate the kind of significant overbreadth that satisfies the *Broadrick* standard. If the requirement of *substantial* overbreadth is to have any meaning, it compels the conclusion that, because there is virtually no potential for punishment of mistaken claims of military awards, the Act is not unconstitutionally overbroad in this regard.

B

Second, the majority argues that the Act might be applied to satire or other kinds of imaginative expression—such as a

person who claims he has received a military decoration sarcastically, or while playing a role in a play or movie—and thus criminalizes even those statements that are plainly incredible and not worthy of actual belief. *See* Maj. Op. at 11874. The majority states: "[W]hether it be method actors getting into character, satirists being ironic or sarcastic, poets using hyperbole, or authors crafting a story, creative persons often make factual statements or assertions which, as they are fully aware, are entirely untrue." *Id.* at 11874. The majority presents examples of "[s]atirical entertainment such as The Onion, The Daily Show, and The Colbert Report." *Id.* at 11874.

Although the Supreme Court has never so held, I am quite confident that satirical or theatrical statements claiming receipt of a military award are protected under the First Amendment. Provocative statements by satirists are not generally thought to come within the class of unprotected "false statements of fact" because these statements "could not reasonably [be] interpreted as stating actual facts." *Hustler*, 485 U.S. at 50; *see also Milkovich*, 497 U.S. at 20.

But claims about military decorations and medals made in an artistic context are not subject to prosecution under the most reasonable construction of the Act. Once again, "[f]acial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute." *Broadrick*, 413 U.S. at 613. Since the first definition of the word "represent" is "[t]o bring clearly before the mind," WEBSTER'S at 1926, the Act can plausibly be interpreted to preclude its application to statements that cannot "reasonably [be] interpreted as stating actual facts," *Hustler*, 485 U.S. at 50, because statements that cannot reasonably be interpreted to be true would not "bring clearly before the mind" of the listener that the speaker is stating actual facts about himself.

If, for example, Stephen Colbert mocked a president's statement that he had "won" an ongoing war by proclaiming,

sarcastically, "Right—and I won the Congressional Medal of Honor," I doubt that anyone would think that Colbert had "represented" himself as a Medal of Honor winner. Or, to take a second example, actor Tom Hanks "received" the Medal of Honor in the movie *Forrest Gump*. In fact, Lieutenant Dan could not have made it clearer in the movie that Forrest had received the Congressional Medal of Honor:

> Lt. Dan: They gave you the Congressional Medal of Honor.
>
> Forrest: Now that's Lieutenant Dan. Lieutenant Dan!
>
> Lt. Dan: They gave you the Congressional Medal of Honor!
>
> Forrest: Yes sir, they sure did.
>
> Lt. Dan: They gave you[,] an imbecile, a moron who goes on television and makes a fool out of himself in front of the whole damn country, the Congressional Medal of Honor.
>
> Forrest: Yes sir.

*Forrest Gump* (1994), *available at* http://www.generation terrorists.com/quotes/.html (last visited July 6, 2010); *see also The Karate Kid* (1984) (representing that Mr. Miyagi, played by actor Pat Morita, had received the Congressional Medal of Honor for his heroism in World War II); *The Next Karate Kid* (1994) (showing Mr. Miyagi wearing the Congressional Medal of Honor). But we all understood the context: Tom Hanks *qua* Forrest Gump received the Medal of Honor. Forrest Gump cannot be charged with violating the Act and, so far as I am aware, Tom Hanks *qua* Tom Hanks has never "represented himself" as a Medal of Honor recipient. I do not believe it realistic that anyone would think to accuse Colbert or Hanks of violating the Stolen Valor Act in these contexts.

Assuming, as I must, that the Act will be applied with some modicum of common sense, it does not reach satire or imaginative expression.

* * * * *

I would conclude that the Act is reasonably susceptible to a limiting construction that eliminates any potential overbreadth and, even if the Act did have some degree of overbreadth, this overbreadth is not "substantial." I would hold that the Act is not overbroad and therefore facially constitutional.

## IV

The majority's opinion is provocative, to say the least. It effectively overrules *Gertz* and its progeny and holds that false statements of fact generally receive First Amendment protection. It effectively overrules *Garrison* by holding that even *knowingly* false statements of fact are protected. It holds that a false statement of fact must produce "irreparable harm" in order to lose First Amendment protection, thus wholly confusing the concept of unprotected speech and calling into question the Supreme Court's obscenity jurisprudence. And it strikes down an act of Congress on its face despite the most important consideration to this case: no person has ever been subjected to an unconstitutional prosecution under the Stolen Valor Act and, under any reasonable interpretation of the Act, it is extremely unlikely that anyone ever will be.

I respectfully dissent.